OPINION
{¶ 1} Steven Coleman is appealing the judgment of the Champaign County Common Pleas Court, which found him guilty of multiple counts of theft and engaging in a pattern of corrupt activity.
 {¶ 2} Coleman operated his own roofing business, Red's Roofing, in Champaign County, Ohio. Coleman's charges arose out of four separate business dealings with four separate homeowners.
 The Ewings {¶ 3} In September of 1998, the roof on the Ewings' home suffered damage in a hailstorm. As a result, their insurance company appraised the damage to the home and estimated the cost of repair to be $6,726.47. The insurance company then issued the Ewings a check in that amount. Coleman came to the Ewing's home and gave an estimate. Mr. Ewing testified that he did not recall the amount of the estimate nor did he have a written record of the estimate. Ewing testified that he had agreed to advance to Coleman the amount necessary for materials and that the amount for labor would be paid when the job was completed. Mr. Ewing could not recall how much money he gave Coleman in advance of the project but estimated the amount as $3000. On September 28, 1998, Mr. Ewing discovered damage to his garage roof that Coleman estimated would cost $980 for repair with $400 of this amount being for materials.
 {¶ 4} When Coleman began work on the project, he discovered that the roofing technique that was the basis for the insurance estimate was not feasible as there was additional damage to roof. Therefore, he informed Ewing that it would be necessary to do additional work and recommended that the Ewings apply for additional money from their insurance company to cover the hidden damage. The insurance company issued a supplemental check for $4,489 that included the garage repair and the additional work on the roof to the house.
 {¶ 5} Mr. Ewing testified that during the work on the house Coleman had repeatedly asked for additional money. Mr. Ewing testified that in November of 1998, Coleman had threatened to cease work on Ewing's home unless he paid Coleman an additional $1000. Mr. Ewing then wrote a check for $1000 payable to Peoples Savings, a bank wherein Coleman had an account, and delivered the check to the bank. This check was placed in an envelope that stated this check was only to be deposited in Coleman's account if Mr. Ewing or his wife called by November 18, 1998 and the roofing work on the home had been completed. The work was not completed by that date. Thus, the Ewings never called and the check was not cashed.
 {¶ 6} On one occasion, Coleman approached Mrs. Ewing while she was at her employer's workplace and asked for $1000. Ms. Ewing wrote Coleman a check for $1000; however, she stopped payment on the check before it was cashed. Coleman eventually left the project despite it not being completed, initially taking the materials with him but later returning the materials.
 {¶ 7} The Ewings hired Sam Newsome to complete the roofing job, which cost the Ewings an additional $1500. Mr. Ewing testified that after Coleman had left the project, only a thousand dollars of the money from the insurance company had remained. However, the State presented no evidence in the form of cashed checks, banking records, or testimony of how much money was given to Coleman. The only testimony Mr. Ewing provided regarding money he gave to Coleman was the down payment that he estimated at between 2,000 and 3,000 dollars and his statement that only $1,000 remained in the account in which the insurance checks were deposited after Coleman left the job.
 {¶ 8} As a result of his dealings with the Ewings, Coleman was indicted in December of 2001 with one count of grand theft beyond the scope of consent in violation of R.C. 2913.02(A)(2) and one count of grand theft by deception. Coleman was eventually convicted of these charges. The court determined that the charges were allied offenses of similar import and therefore gave Coleman one sentence of seventeen months of incarceration.
 The Snapps {¶ 9} In October of 2001, the Snapps had a leak in their roof and received an estimate from Coleman to tear off the old roof and replace it with a new one for $9000. The estimate provided that Snapp would give Coleman $5000 for a down payment, $3000 after the old roof was removed, and $1000 when the work was completed. Although the proposal was not signed, Snapp gave Coleman a check for $5000 on October 2, 2001. Coleman told Snapp that he had a couple other jobs to complete but that then he would get to work on Snapp's house. Snapp testified that Coleman had said that the $5000 was for materials and that he would get the materials and place them in his driveway. Snapp further testified that Coleman had said that it was tough getting the type of shingles Snapp had wanted but that he could get them. Snapp testified that Coleman had told him he would need 35 squares of the shingles and that he would order them at Skelley Lumber. Snapp testified that the following day Coleman had told him that Skelley Lumber had not had enough of the shingles for Snapp's house, so Coleman had looked for the shingles at S L Lumber. S L Lumber also did not have the shingles so Coleman had ordered them from S L Lumber. Snapp testified that Coleman had said that the new shingles would be available in two weeks. Snapp testified that Coleman had asked for additional money, which Snapp had refused to give him. Snapp stated Coleman had then said the shingles would take an additional week.
 {¶ 10} Snapp then went to S L Lumber and spoke with the manager, who Snapp testified had told him that the shingles had not been ordered because Coleman would not pay for the shingles in advance. Additionally after talking with the lumberyard and his grandson, Snapp believed that he would need less than 25 squares for his roofing job. Further, Snapp became interested in whether Coleman had workers compensation insurance.
 {¶ 11} Less than a week after entering into their contract, on October 6, 2001, Snapp testified that Coleman had offered to return to Snapp his $5000 and had executed a promissory note to that effect. Snapp testified that Coleman had called him later in October and had said that he had 25 squares of the shingles, which was enough to start Snapp's home. According to Snapp, he told Coleman that he could work on the roof but only if he brought the receipt for the shingles. At this response, Coleman hung up on him.
 {¶ 12} In late November, Snapp had Coleman sign a new contract that he had drafted that adds several conditions to the parties' original agreement. Further, Snapp testified that despite executing this new contract with Coleman, he never had any intention of letting Coleman repair his roof but rather that he had only been trying to get Coleman to give him $5000 worth of materials.
 {¶ 13} As a result of his dealings with the Snapps, Coleman was indicted on two counts of theft from an elderly person in violation of R.C. 2913.02(A)(2) and (A)(3). Coleman was subsequently convicted of these counts, which the court determined were allied offenses of similar import, and received a sentence of four years of incarceration.
 Brandyberry and Hamilton {¶ 14} Mr. Hamilton and Mr. Brandyberry lived in a house owned by Mr. Hamilton in Urbana, Ohio. On October 11, 2001, Brandyberry, acting as Hamilton's agent, signed a contract with Coleman for roofing. The contract provided that Brandyberry would obtain the materials and Coleman would provide the labor for a fee of $4,500. The roofing job included a complete tear off of the old roof, resheeting the roof, 5 x 7 flashing and counter flashing, and complete clean up and haul away. Additionally, the contract provided that the project was to be completed by October 30, 2001. Brandyberry paid $2,500 to Coleman before starting the project and was to pay the remaining $2,000 upon his completion of the project. Brandyberry ordered the shingles on approximately October 18, 2001. The shingles did not arrive until late October or early November.
 {¶ 15} In the middle of tearing off the old roof, Coleman told Brandyberry that the job had been underestimated and that he would not complete the roofing job without an additional $1000. Brandyberry and Hamilton made partial payments on the new total of $5500. By early December, Brandyberry and Hamilton had paid Coleman $4700. At this point, Coleman had completed the tear off of all of the old roofing, had placed the plywood sheeting, had put down new tar paper, and had fully completed approximately an eighth of the roof. Brandyberry and Hamilton were unhappy with the pace of the roof repair and the fact that the work had always been sporadic with many days where no work was done on the house. On December 7, 2001, Brandyberry testified that Coleman had stated that without more money he would work on their roof on his own time schedule. Brandyberry contacted the police. On December 8, 2001, Coleman approached Brandyberry about completing the roof project but Brandyberry terminated the contract. Brandyberry hired another contractor to complete the roof project.
 {¶ 16} Out of his dealings with Brandberry and Hamilton, Coleman was indicted on one count of theft beyond the scope of intent and one count of theft by deception. Coleman was subsequently convicted of these charges and received a single sentence of eleven months because the crimes were allied offenses of similar import.
 Torsell {¶ 17} Torsell's home in Urbana, Ohio needed some roofing work. On October 14, 2001, Torsell entered into a contract with Coleman for a complete tear off, repair of sheeting where necessary, refelting, new shingles, and other incidentals. Pursuant to the contract, Torsell was to pay Coleman a total of $9,200, with $5000 paid up front and various amounts of progress payments until completed. In actuality, Torsell paid a $6500 deposit. Coleman told Torsell that he could start in a couple weeks after he had completed a couple other jobs. Torsell had a tree trimmed that was blocking a portion of the roof on October 26, 2001.
 {¶ 18} Coleman approached Torsell and told him that he had an equipment problem and had trouble with his net cash flow. Coleman told Torsell that if he could advance the remainder due on the roofing project, Coleman would reduce the cost by $500. Torsell did not have the rest of the money, but he gave Coleman an additional $1500. There was no evidence that Coleman ever ordered any of the materials, and no work was ever performed on Torsell's home.
 {¶ 19} As a result of Coleman's business dealings with Torsell, Coleman was charged with grand theft beyond the scope of consent in violation of R.C. 2913.02(A)(2) and grand theft by deception in violation of R.C. 2913.02(A)(3). Coleman was subsequently convicted of these counts, which the court determined were allied offenses of similar import, and was sentenced to seventeen months of incarceration.
 {¶ 20} Additionally, Coleman was indicted with one count of engaging in a pattern of corrupt activity in violation of R.C.2923.32(A)(1) for his business dealings with the Ewings, the Snapps, Torsell, and Brandyberry and Hamilton. Coleman was also convicted of this charge and sentenced to four years of incarceration. Coleman had a trial to the bench as he had waived his right to a jury trial. All of Coleman's sentences were to be served concurrently.
 {¶ 21} Coleman has filed this appeal from his convictions, raising the following assignments of error.
 {¶ 22} "1. APPELLANT'S CONVICTIONS WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
 {¶ 23} "2. THE COURT ERRED IN ADMITTING PREJUDICIAL TESTIMONY OVER OBJECTION.
 {¶ 24} "3. APPELLANT'S SENTENCE WAS EXCESSIVE AND UNSUPPORTED BY THE RECORD.
 {¶ 25} "4. APPELLANT WAS DENIED HIS CONSTITUTIONALLY GUARANTEED RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL.
 {¶ 26} "5. THE CUMULATIVE EFFECT OF THE ERRORS OCCURRING AT TRIAL DEPRIVED APPELLANT OF A FAIR TRIAL."
Appellant's first assignment of error:
 {¶ 27} Coleman argues that his convictions were against the manifest weight of the evidence, specifically that the State could not prove that he had the intent to deprive the owners of their money. We agree as to the Ewings, the Snapps, and Brandyberry and Hamilton. However, we disagree as to Torsell.
 {¶ 28} When a conviction is challenged on appeal as being against the manifest weight of the evidence, we must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Thompkins (1997), 78 Ohio St.3d 380, 387,1997-Ohio-52, citing State v. Martin (1983), 20 Ohio App.3d 172, 175. A judgment should be reversed as being against the manifest weight of the evidence "only in the exceptional case in which the evidence weighs heavily against the conviction." Martin, supra at 175.
 {¶ 29} When proving a violation of R.C. 2913.02(A)(3), the State must demonstrate that at the time the defendant took the money he had no intent to repay the money or perform under the contract in exchange.State v. Bakies (1991), 71 Ohio App.3d 810. Additionally, for a violation of R.C. 2913.02(A)(2), the State must prove that at the time the defendant exceeded the scope of consent of the owner of the money, he had the intent to deprive the owner of the money. State v. Dortch (October 15, 1999), Montgomery App. No. 17700; State v. Metheney (1993),87 Ohio App.3d 562. Further, the Metheney court noted that nonpayment alone was not sufficient to prove a party's intent not to pay. Metheney, supra at 567.
 The Ewings {¶ 30} The elements of Coleman's conviction against the Ewings for theft beyond the scope of consent were that Coleman in Champaign County (1) knowingly (2) obtained or exerted control over property (3) with purpose to deprive the owners thereof (4) beyond the scope of the express or implied consent of the owners and that (5) the value of the property is $5,000 or more but less than $100,000. The elements for Coleman's conviction for theft by deception against the Ewings are the same except element (4) would read by deception.
 {¶ 31} In order to convict Coleman, the State needed to show that he purposely intended to deprive the Ewings of their money when he took the money or when he exceeded the consent of the owners. The State did not establish this. Although, the State asserts that we can infer from the fact that Coleman did not complete the roofing work that he had the requisite intent, this is negated by Coleman's actions. After taking the Ewings' down payment, Ewing admitted that Coleman had done a significant amount of work and had obtained the materials to complete the job. This contradicts the State's argument that Coleman intended to deprive the Ewings of over $5000.
 {¶ 32} Further, the State has difficulty establishing that Coleman took in excess of $5000 from them. At trial, the State failed to present any cashed check or receipts of money given to Coleman from the Ewings. Further, the Ewings did not testify to any specific event where they gave Coleman money, other than the down payment that Mr. Ewing approximated was between $2,000 and $3,000. The only additional evidence of money given to Coleman by the Ewings was Ewing's statement that after Coleman left the project, only a thousand dollars remained in the account from the $11,215.47 they received from the insurance company. We find that this statement is too vague absent some evidence of disbursements from the insurance checks to support the conclusion that the Ewings gave Coleman over $5000.
 {¶ 33} Further, Coleman did perform work on the Ewings' roof pursuant to the contract and did obtain materials for them. The fact that a subsequent roofer charged only $1500 to complete the roofing project that the insurance company's adjuster estimated would cost $11,215.47, indicates that a significant amount of the roofing project was completed by Coleman. The value of whatever work he performed should have been deducted from the amount given to him by the Ewings. Therefore, the State also did not sufficiently prove that Coleman took at least $5000 from the Ewings.
 {¶ 34} Thus, Coleman's convictions in counts 1 and 2 for grand theft stemming from his dealings with the Ewings are against the manifest weight of the evidence and are reversed.
 The Snapps {¶ 35} The elements of Coleman's conviction for grand theft beyond the scope of consent stemming from his dealing with the Snapps were that Coleman, in Champaign County (1) knowingly (2) obtained or exerted control over property (3) with the purpose to deprive the owners thereof (4) beyond the scope of the express or implied consent of the owners (5) that the value of the property is $5,000 or more, but less than $100,000, and (6) that the owners are sixty-five years of age or older. The elements for Coleman's conviction for grand theft by deception are the same except the fourth element would read by deception.
 {¶ 36} The State argues that the trial court could have inferred Coleman intended to purposely deprive the Snapps of their property from the fact that Coleman took $5000 from Snapp and never performed any work on the Snapps' house. However, this disregards the fact that Coleman told Snapp that he had ordered the shingles and that Coleman testified that he had thought he had ordered the shingles, but only later had learned that his order had not been sent because he had not paid for the shingles in advance. Snapp testified that he had been told by S L Lumber's manager that the shingles had not been ordered because Coleman would not pay for the materials upfront.[1] However, the mere fact that Coleman attempted to order Snapp's shingles indicates he intended to perform the work according to the contract when he took the money from the Snapps.
 {¶ 37} Further, Snapp attempted to cancel his contract with Coleman and demand his money back less than a week after entering into the contract. Although Coleman no longer had $5000 to give to Snapp, he did execute a promissory note stating that he would repay Snapp. Also, Snapp admitted that Coleman subsequently called and stated that he had shingles for him and offered to start his roofing project and signed a new contract with Snapp to roof his home, but it was Snapp who no longer wanted Coleman to work on his house and who never intended to comply with the contract. Coleman's actions negate the State's argument that Coleman intended to deprive Snapp of the money. Although Coleman used Snapp's $5000 for something other than the roofing materials for Snapp's home, this does not mean that when Coleman took the money he intended never to perform the roofing services under the contract.
 {¶ 38} Additionally, Coleman was under no obligation to use the exact $5000 that Snapp gave him to order materials for Snapp's roof. The down payment of $5000 was Coleman's to use as he desired so long as he performed under the contract. Thus Coleman could not have exceeded the scope of the owner's consent in his use of the money, much less intended to deprive Snapp of the money by so doing. Further, the fact that Coleman never returned any of the funds or performed any services on the home is not dispositive of this case, as the facts reveal that Coleman and Snapp were negotiating and signing promissory notes and new contracts until shortly before Coleman was indicted on these charges. The State failed to prove that Coleman intended to deprive the Snapps of their money. Coleman's convictions for theft from an elderly person arising out of his dealings with the Snapps are against the manifest weight of the evidence. Coleman's convictions on counts 4 and 5 are reversed.
 Brandyberry and Hamilton {¶ 39} The elements the State had to prove for Coleman's conviction for theft beyond the scope of consent for his dealings with Brandyberry and Hamilton were that Coleman in Champaign County (1) knowingly (2) obtained or exerted control over property (3) with purpose to deprive the owners thereof (4) beyond the scope of the express or implied consent of the owners and that (5) the value of the property is $500.00 or more, but less than $5,000.00. The elements for Coleman's conviction for theft by deception that arose from these dealings were the same except that the fourth element would read by deception.
 {¶ 40} The State argues that we can infer the fact that Coleman intended to deprive Brandyberry and Hamilton of their money from the fact that Coleman did not complete the contracted for roofing project. However, Coleman did perform partially on the contract he entered into with Brandyberry. Coleman completed the tear off of the old roof and all of the underlayment necessary. Additionally, he had installed the new shingles on one eighth of the roof. Rather it was Brandyberry, dissatisfied with the pace of the roofing project and angered that Coleman wanted more money, who told Coleman that he no longer wanted Coleman to work on the house on the seventh or eighth of December. The fact that Coleman performed a significant amount of work under the contract with Brandyberry indicates that Coleman intended to perform according to the contract. Moreover, the State cannot establish that Coleman exceeded the scope of the owner's consent as Coleman could do whatever he desired with the money so long as he performed under the contract. The State's evidence did not establish facts from which one could infer that Coleman took Brandyberry and Hamilton's money with the intent to deprive them of it.
 {¶ 41} Coleman's convictions on counts 6 and 7 for his dealings with Brandyberry and Hamilton are against the manifest weight of the evidence and are reversed.
 Torsell {¶ 42} The elements the State needed to prove to convict Coleman of grand theft beyond the scope of consent on count 10 for his dealings with Torsell were that Coleman, in Champaign County (1) knowingly (2) obtained or exerted control over property (3) with purpose to deprive the owner thereof (4) beyond the scope of express or implied consent of the owner and that (5) the value of the property is $5000.00 or more, but less than $100,000.00. The elements for grand theft by deception were the same except the fourth element would read by deception.
 {¶ 43} The State argues that we can infer from the fact that Coleman took Torsell's money that he intended to deprive Torsell of the money. We agree. Coleman took $8,000 from Torsell in two checks. Torsell testified that Coleman had never begun any of the work on his home's roof or had provided him with any of the materials necessary to perform the roofing. Moreover, no evidence was presented at trial that Coleman ever even ordered the shingles for Torsell's residence. The fact that Torsell contracted with Coleman in the middle of October and that in the middle of December, Coleman had performed none of the work or ordered any of the materials amounted to evidence from which a reasonable trier of fact could have inferred that Coleman intended to deprive Torsell of his property. Coleman's convictions on counts 10 and 11 for his dealings with Torsell are not against the manifest weight of the evidence and are affirmed.
 Pattern of Corrupt Activity {¶ 44} The elements the State was required to prove for Coleman's conviction for a pattern of corrupt activity, count 16, were that Coleman, in Champaign County (1) was employed by or associated with any enterprise (2) conducted or participated in the affairs of said enterprise (3) directly or indirectly (4) through a pattern of corrupt activity.
 {¶ 45} R.C. 2923.31(E) defines a pattern of corrupt activity as "two or more incidents of corrupt activity, whether or not there has been a prior conviction, that are related to the affairs of the same enterprise, are not isolated, and are not so closely related to each other and connected in time and place that they constitute a single event."
 {¶ 46} We have determined above that only Coleman's convictions stemming from his dealings with Torsell were supported by the manifest weight of the evidence. The State concedes that counts 10 and 11 that involve Coleman's contract with Torsell are a single predicate act. Since only a conviction for a single predicate act was supported by the manifest weight of the evidence, we cannot find that Coleman engaged in a pattern of corrupt activity. Therefore, Coleman's conviction for engaging in a pattern of corrupt activity is against the manifest weight of the evidence and is reversed.
 {¶ 47} Coleman's first assignment of error is sustained as to counts 1, 2, 4, 5, 6, 7, and 16 and overruled as to counts 10 and 11.
Appellant's second assignment of error:
 {¶ 48} Coleman argues that the trial court committed reversible error in admitting the testimony of Donald Moore and his daughter. We disagree.
 {¶ 49} When a criminal matter is tried to a bench, there is a presumption that the trial court considered only relevant, material, and competent evidence in reaching its judgment, absent affirmative evidence to the contrary in the record. State v. Post (1987), 32 Ohio St.3d 380,384. Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid. R. 401. Unless prohibited by a constitutional provision, statute, or court rules, all relevant evidence is admissible. Despite relevance, evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Evid. R. 403(A).
 {¶ 50} At trial, the State presented the testimony of Donald Moore and his daughter over defense counsel's objection. The State presented the testimony in order to show that Coleman gave a portion of the $5000 he received from Snapp to Moore to pay on a debt Coleman owed him. We think that this testimony was of questionable relevance. However, in this case, we think any error in admitting this testimony was harmless. The testimony of Moore and his daughter did not impact the outcome of the trial. Coleman's second assignment of error is without merit and overruled.
 Appellant's third assignment of error: {¶ 51} Coleman argues that his sentence was not supported by the record and too harsh under the circumstances. We disagree.
 {¶ 52} Coleman essentially reiterates his arguments in his first assignment of error to state that his sentences were not supported by the record. As we have found that counts 1, 2, 4, 5, 6, 7, and 16 were against the manifest weight of the evidence, these convictions are reversed and their sentences vacated. However, the convictions and sentence of 17 months remains for counts 10 and 11. We find that the trial court complied with all applicable sentencing procedures. The trial court stated its reasons for the sentences on the record, including why more than the minimum sentence was imposed. Further, the sentence was within the possible statutory range. Thus, we can find no basis for Coleman's appeal of his sentence for counts 10 and 11. Coleman's assignment of error is without merit and overruled.
 Appellant's fourth assignment of error: {¶ 53} Coleman argues that he was rendered ineffective assistance of counsel by his counsel's failure to object to improper testimony, particularly hearsay testimony.
 {¶ 54} We evaluate ineffective assistance of counsel arguments in light of the two prong analysis set forth in Strickland v. Washington
(1984), 466 U.S. 668. Trial counsel is entitled to a strong presumption that his or her conduct falls within the wide range of reasonable assistance. See id. at 688. To reverse a conviction based on ineffective assistance of counsel, it must be demonstrated that trial counsel's conduct fell below an objective standard of reasonableness and that his errors were serious enough to create a reasonable probability that, but for the errors, the result of the trial would have been different. See id. at 687. Hindsight is not permitted to distort the assessment of what was reasonable in light of counsel's perspective at the time, and a debatable decision concerning trial strategy cannot form the basis of a finding of ineffective assistance of counsel. See id. at 689.
 {¶ 55} Initially, Coleman asserts that his counsel was ineffective for failing to object to photographs of the Ewings' roof that he asserts were not properly authenticated. In particular, Coleman asserts that the date the pictures were taken was not established. Mr. Ewing testified that he had taken the pictures some time after Coleman had ceased working on the roof but before Newsome had begun work on the house. We believe the photographs were sufficiently authenticated. Further, the State argues that Coleman was not prejudiced by the admission of these photographs as Newsome testified regarding the additional work he had to perform on the Ewings' house after Coleman left. We agree that these photographs were not prejudicial to Coleman and did not amount to ineffective assistance of counsel. Moreover, this issue is moot as we have determined above that Coleman's convictions stemming from his contract with Ewing were against the manifest weight of the evidence.
 {¶ 56} Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid. R. 801(C).
 {¶ 57} Coleman argues that his trial counsel was ineffective in permitting the following testimony that Coleman asserts was hearsay. Coleman argues that Brandt, an insurance adjuster for the Ewings' insurance company, Indiana Insurance, should not have been permitted to testify in place of the adjuster who handled the claim based solely on his review of the business records. Evid. R. 803(6) provides an exception to hearsay for a business record kept in the ordinary course of business. In this case, Brandt testified regarding business records kept by Indiana Insurance, specifically stating that the records had been kept in the ordinary course of business. The State proceeded to admit into evidence the business records. The State asserts that Brandt merely authenticated the records and commented on them from his own experience as to how to use the records. We do not find that this was hearsay. Thus, Coleman's counsel was not ineffective for failing to object to the testimony.
 {¶ 58} Coleman asserts that Snapp's testimony was riddled with hearsay to which his counsel failed to object. Snapp testified about statements his grandson had told him about how many shingles had been needed to repair his roof and statements the police had made to him suggesting that he have police present when Coleman delivered the materials. Further, Snapp testified to statements made by the police repeating statements reportedly made by Coleman. The State asserts that these statements are not hearsay as they were not offered for the truth of the matter asserted. Rather, the State argues that the statements were offered to explain Snapp's course of action. We agree. As the statements were not hearsay, Coleman's counsel was not ineffective for failing to object to the statements.
 {¶ 59} Also, Snapp testified as to statements that had been made to him by the manager of S L Lumber regarding whether Coleman had ordered shingles for Snapp's roof. Snapp testified that the manager had told him that Coleman had not had any shingles on order. The State argues that this statement was also offered to explain Snapp's course of action. We cannot agree that this was the sole purpose for the State's presentation of this evidence. This evidence was relevant to the element of whether Coleman intended to deprive Snapp of the money when he took the funds. The statement tended to prove that Coleman had never placed any order for materials for Snapp's roofing project, which would tend to indicate that Coleman had never intended to perform under the contract with Snapp. As so little evidence was presented on the issue of Coleman's intent to deprive, this evidence was significant. We find that there is a reasonable probability that the outcome of the trial may have been different absent this evidence. Since we have determined above that Coleman's convictions for his dealings with the Snapps were against the manifest weight of the evidence, the issue of whether Coleman was rendered ineffective assistance of counsel by his counsel's failure to object to this hearsay is moot. However, we note for any possible future retrial of this matter that this would amount to impermissible hearsay testimony.
 {¶ 60} Similarly, Coleman argues that his counsel failed to object to the hearsay testimony of Officer Carl Bader. Bader testified that he had learned from Mr. Skelley of Skelley Lumber that Coleman had not had any shingles on order for the Snapps. (Tr. 170-171). As in Snapp's testimony, Coleman's counsel should have objected to Bader's testimony relating what he was told by Skelley Lumber as to whether Coleman had ordered any shingles for Snapp. The issue of whether this amounted to ineffective assistance of counsel is moot due to our decision in the first assignment of error. However, we note for any possible future retrial that this would be impermissible hearsay.
 {¶ 61} Additionally, Coleman argues his counsel should have objected to Torsell's testimony that Coleman's workers told him that they had not been paid. The State does not address this testimony. We find that this is not hearsay as it was not offered for the truth of the matter asserted. Therefore, Coleman's counsel was not ineffective for failing to object to the testimony.
 {¶ 62} Further, Coleman argues that his counsel should have objected to James Inskeep's testimony as hearsay. The State called Inskeep as a witness to rebut character evidence offered by Coleman. Inskeep's testimony amounted to reputation evidence as provided for in Evid. R. 405(A). However, Inskeep did exceed simply talking about the fact that on several occasions he had to complete roofing jobs that Coleman had started but failed to complete and inferred from this that Coleman had a negative reputation in the community. Inskeep testified, "everybody that's called me has always said that he has been dishonest with them." (Tr. 454). In this testimony, Coleman's counsel elicited improper hearsay testimony. However, we cannot say that this error was serious enough to create a reasonable probability that without the error, the result of the trial would have been different. This did not amount to ineffective assistance of counsel.
 {¶ 63} Finally, Coleman argues that the testimony of Moore was replete with hearsay to which his counsel failed to object. Coleman fails to point to specific statements in Moore's testimony that were hearsay. Coleman had the duty to specifically point to hearsay statements to which his counsel failed to object. Thus, we will not search through Moore's testimony to determine which statements if any were hearsay.
 {¶ 64} Even when all of these alleged errors by his counsel are considered together, we cannot find that Coleman was rendered ineffective assistance of counsel as it applies to his remaining conviction for his dealings with Torsell. Coleman's fourth assignment of error is without merit and is overruled.
 Appellant's fifth assignment of error: {¶ 65} Coleman argues that if we determine that the errors that occurred during trial did not rise to the level of prejudicial error, his conviction should still be reversed as the cumulative effect of the errors deprived him of the right to a fair trial. We disagree.
 {¶ 66} We have already determined that all of Coleman's convictions except those arising out of his contract with Torsell were against the manifest weight of the evidence and are reversed. However, we do not think that any of the additional errors that occurred, even cumulatively, deprived Coleman of his right to a fair trial. Coleman's fifth assignment of error is without merit and is overruled.
 {¶ 67} The judgment of the trial court is affirmed in part, reversed in part, and the matter is remanded for further proceedings consistent with this court's opinion.
FAIN, P.J. and GRADY, J., concur.
[1] As an aside, we note that Snapp's testimony regarding what the lumberyard's manager told him was hearsay and should have been objected to by defense counsel.