OPINION
{¶ 1} Christopher Wells, a home remodeler and general contractor, was found guilty of one count of theft by deception and one count of theft beyond the scope of consent, both fourth degree felonies, after a bench trial in the Champaign County Court of Common Pleas. The charges stemmed from Wells' failure to perform exterior renovations to the home of Daniel *Page 2 
Walter ("Walter") and Cheryl Dixon Walter ("Dixon"). Wells was acquitted of two additional theft charges arising out of his failure to pay for windows installed in the home of Anthony Artis. The court sentenced Wells to three years of community control and a $150 fine on each count, to be served concurrently. The court also awarded restitution in the amount of $13,689.21 to Walter and Dixon.
 {¶ 2} Wells appeals from his convictions, arguing that his convictions were based on insufficient evidence and were against the manifest weight of the evidence. He also claims that his counsel rendered ineffective assistance. For the following reasons, the trial court's judgment will be affirmed, as modified.
 I {¶ 3} The State's evidence at trial established the following facts.
 {¶ 4} In October 2005, Walter and his then-fiancee, Dixon, were interested in having extensive interior and exterior remodeling work done to Walter's home at 932 Old Farm Road in Urbana, Ohio. Walter responded to a newspaper advertisement for CM3 Construction, Wells' company.
 {¶ 5} On October 20, 2005, Wells sent Walter an initial proposal for the remodeling work. The proposed interior work consisted of removing the existing flooring and replacing it with solid cherry wood flooring; expanding the master bathroom to include a new tile shower and fixtures; painting walls, ceiling, trim, and doors; and providing recessed kitchen and dining room light fixtures. The exterior work included removing the vinyl siding and replacing it with brick and installing a new roof over the existing roof.
 {¶ 6} On December 10, 2005, Wells sent Walter and Dixon a revised proposal, *Page 3 
which described the project in more detail and proposed that some cedar siding be used on the east and west gables. The cover letter for the proposal stated that Wells had found brick samples that closely matched the existing brick on the house. Wells indicated, however, that the brick would no longer be in production after January 1, 2006, and that he anticipated that the price of brick and steel would increase up to 9% after that date. Wells informed Walter and Dixon that the supplier had approximately 17,000 bricks available and that he had asked the supplier to put a hold on the bricks until December 18.
 {¶ 7} On December 22, 2005, Walter wrote a check to CM3 in the amount of $9,689.21 so that Wells could purchase masonry materials and brick. The following day, Wells placed an order for Olde Detroit brick with Chris Brewer, a salesperson for Bryce Hill, Inc. Wells did not pay for the brick at that time, and he did not complete the purchase on any subsequent date.
 {¶ 8} On December 30, 2005, Dixon wrote a check for $5,000, which was intended to be a general deposit for materials.
 {¶ 9} On January 21, 2006, Walter and Dixon entered into a contract with Wells for Wells to remodel Walter's home. The final contract provided that Wells would remove vinyl siding on the exterior of the home and replace it with brick, install cedar siding on certain areas of the home, repair the front porch, install a roof overlay, and repair chimney flashing. The interior remodeling included, among other things, installing hardwood floors, expanding and upgrading the master bathroom, replacing the thermostat, reupholstering the breakfast nook furniture, performing electrical work, and painting. The total price for the project was $49,674.19. *Page 4 
 {¶ 10} The payment terms indicated that $9,689.21 had been received for exterior brick materials and a $5,000 advance had been paid for interior startup costs. Four payments of $8,800, $5,350, $4,622, and $3,701.41, respectively, would be due on specific dates in January and February for the interior work. Three payments of $4,000, $4,000, and $2,000, respectively, would be due in March 2006 for the exterior work. Dixon wrote a check for $8,800 on January 21, 2006, when the contract was signed.
 {¶ 11} The interior portion of the project began at the end of January 2006. Walter paid Wells $5,350 on January 31, 2006, and $4,622 on February 13, 2006. On March 31, 2006, Walter paid $3,704.41.
 {¶ 12} Throughout the remodeling project, Walter requested several changes and upgrades. Wells performed this additional work for an additional cost. According to Walter and Dixon, these "extras" were paid for at the time they were performed. On February 24 and again on March 8, 2006, Walter paid $2,000 for foundation work that arose unexpectedly. The charges for other extras were paid on April 19 ($2,000), May 9 ($2,389.74), and June 3, 2006 ($1,290.59).
 {¶ 13} By the beginning of June 2006, the interior renovations were substantially complete. On June 3, 2006, Walter and Wells discussed Wells' plans for beginning the exterior portion of the project. The following day, Dixon wrote a check for $4,000 as a deposit for masonry labor.
 {¶ 14} Walter and Dixon were married on June 9, 2006, and they went on a ten-day honeymoon. When they returned on June 20, they expected to see a new porch, the beginning of siding being removed from the house, and the beginning of bricks *Page 5 
being laid in place of the siding. Instead, Walter and Dixon found a note from Wells, dated June 19, 2006, apologizing for failing to begin the work and indicating that events had occurred "that affected me drastically and had left me in a delicate situation." The note asked Walter and Dixon to call Wells so they could arrange a time to "discuss the issues."
 {¶ 15} Walter and Dixon left several angry messages with Wells, but Wells did not return their calls. They denied that they had left Wells a message stating that they were canceling the contract. Walter and Dixon also attempted to locate Wells through Wells' references and family. When they were unsuccessful, Walter and Dixon contacted the police.
 {¶ 16} In July 2006, Walter and Dixon had the locks to the house changed, and they hired Cason Roofing to complete the roofing work. Later, they purchased the bricks directly from Bryce Hill and had another contractor complete the masonry work.
 {¶ 17} In his defense, Wells presented evidence that he had taken steps to obtain bricks for Walter's home, including locking in the price with Bryce Hill. Wells testified that he went to Bryce Hill five to six times in January so that he could pay for the bricks. He stated, however, that he was unable to pay because Brewer had been ill and unavailable to take his payment.
 {¶ 18} In the spring of 2006, Wells began to investigate purchasing a different brick from Snyder Brick and Block. Wells testified that Walter was aware that he (Wells) had not paid for the Olde Detroit brick from Bryce Hill and that Walter had allowed Wells to negotiate with Snyder about purchasing different bricks. In May, Wells received an estimate from Snyder for different bricks at a reduced cost. (On *Page 6 
rebuttal, Walter denied that he had approved of Wells' pricing bricks with Snyder. Walter testified that he thought he had settled on the Olde Detroit brick and thought the bricks had been secured by Wells using the check he had given Wells.)
 {¶ 19} Wells also presented evidence, including the testimony of two subcontractors, that Walter had caused substantial disruptions and delays during the renovations. Wells testified that Walter and Dixon owed him approximately $23,000 in unpaid extras that he performed as part of the interior renovation. Wells disputed Walter and Dixon's assertion that they had fully paid for the extras.
 {¶ 20} In early June, Wells collapsed at Walter's home and began to suffer from chest pain. After Walter and Dixon's wedding, Wells went back to the home, cleaned up the site, set up scaffolding, and finished the interior renovations. Although Wells acknowledged that he left Walter and Dixon a note on June 19, he testified that he intended to complete the contract. Wells stated that, on June 21, he went to the emergency room, where he received a message from Walter canceling the contract. Wells testified that he returned to Walter's house in early July but found another contractor working on the roof. (Walter agreed on rebuttal that he had hired Cason Roofing to replace the roof in early July.) Wells acknowledged, however, that he did not return Walter and Dixon's messages or speak with them after June 4, 2006.
 {¶ 21} During cross-examination of Walter, Wells' counsel attempted to introduce a letter from Wells to Walter, dated June 12, 2006, in which Wells informed Walter of several "extras" for which he had not been paid. The letter indicated that Wells would not begin exterior work until the parties had reached an agreement on the balance due. Upon objection by the State, the trial court excluded the June 12 letter *Page 7 
because it had not been disclosed to the State during discovery.
 {¶ 22} After considering the evidence, the trial court found Wells guilty of grand theft beyond the scope of consent, in violation of R.C. 2913.02(A)(2), and grand theft by deception, in violation of R.C. 2913.02(A)(3), based on the December 22 check for $9,689.21 and the June 4 check for $4,000. The court found that those two checks were written for a specific purpose, that Wells had knowledge of that purpose, and that he failed to use the money for that purpose. The court emphasized that no bricks were purchased or delivered, no exterior work was performed, Wells had tried to negotiate for a lower-cost brick without the homeowner's consent, and Wells had failed to contact Walter and Dixon.
 {¶ 23} Wells appeals from his convictions, raising three assignments of error.
 II {¶ 24} Wells' first and second assignments of error will be addressed together. They state:
 {¶ 25} "I. "THERE WAS INSUFFICIENT EVIDENCE PRESENTED AT TRIAL TO SUPPORT APPELLANT'S CONVICTIONS."
 {¶ 26} "II. "APPELLANT'S CONVICTIONS WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
 {¶ 27} In his first and second assignments of error, Wells claims that his convictions for grand theft were based on insufficient evidence and were against the manifest weight of the evidence. Specifically, Wells argues that the State failed to prove that he took Walter and Dixon's money with the intent to deprive them of it.
 {¶ 28} "A sufficiency of the evidence argument disputes whether the State has *Page 8 
presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law."State v. Wilson, Montgomery App. No. 22581, 2009-Ohio-525, ¶ 10, citingState v. Thompkins, 78 Ohio St.3d 380, 386, 1997-Ohio-52,678 N.E.2d 541. When reviewing whether the State has presented sufficient evidence to support a conviction, the relevant inquiry is whether any rational finder of fact, after viewing the evidence in a light most favorable to the State, could have found the essential elements of the crime proven beyond a reasonable doubt. State v. Dennis, 79 Ohio St.3d 421, 430,1997-Ohio-372, 683 N.E.2d 1096, citing Jackson v. Virginia (1979),443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d. 560. A guilty verdict will not be disturbed on appeal unless "reasonable minds could not reach the conclusion reached by the trier-of-fact." Id.
 {¶ 29} In contrast, "a weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive."Wilson at ¶ 12. When evaluating whether a conviction is contrary to the manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." Thompkins, 78 Ohio St.3d at 387, citing State v. Martin (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717.
 {¶ 30} Because the trier of fact sees and hears the witnesses at trial, we must defer to the factfinder's decisions whether, and to what extent, to credit the testimony *Page 9 
of particular witnesses. State v. Lawson (Aug. 22, 1997), Montgomery App. No. 16288. However, we may determine which of several competing inferences suggested by the evidence should be preferred. Id.
 {¶ 31} The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence. Wilson at ¶ 14. A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. Martin, 20 Ohio App.3d at 175.
 {¶ 32} R.C. 2913.02(A) states: "No person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services in any of the following ways: * * * (2) Beyond the scope of the express or implied consent of the owner or person authorized to give consent; (3) By deception; *
 {¶ 33} "Deception" means "knowingly deceiving another or causing another to be deceived by any false or misleading representation, by withholding information, by preventing another from acquiring information, or by any other conduct, act, or omission that creates, confirms, or perpetuates a false impression in another, including a false impression as to law, value, state of mind, or other objective or subjective fact." R.C. 2913.01(A).
 {¶ 34} For purposes of both theft by deception and theft beyond the scope of consent, the term "deprive" means to do any of the following:
 {¶ 35} "(1) Withhold property of another permanently, or for a period that appropriates a substantial portion of its value or use, or with purpose to restore it only upon payment of a reward or other consideration; *Page 10 
 {¶ 36} "(2) Dispose of property so as to make it unlikely that the owner will recover it;
 {¶ 37} "(3) Accept, use, or appropriate money, property, or services, with purpose not to give proper consideration in return for the money, property, or services, and without reasonable justification or excuse for not giving proper consideration." R.C. 2913.01(C).
 {¶ 38} For theft beyond the scope of consent, the defendant must have had the intent to deprive the owner of the money at the time that he exceeded the scope of the owner's consent. State v. Coleman, Champaign App. No. 2002 CA 17, 2003-Ohio-5724, ¶ 29. In contrast, to prove theft by deception, "the State must demonstrate that at the time the defendant took the money he had no intent to repay the money or perform under the contract in exchange." Id. Because it is difficult to prove a defendant's mental state by direct evidence, a defendant's intent is determined by considering the surrounding facts and circumstances. Id.;State v. Conley, Clermont App. No. CA2004-07-053, 2005-Ohio-3509, ¶ 15. "[P]ersons are presumed to have intended the natural, reasonable and probable consequences of their voluntary acts." State v. Garner,74 Ohio St.3d 49, 60, 1995-Ohio-168, 656 N.E.2d 623.
 {¶ 39} On appeal, Wells claims that the State failed to prove that he intended to deprive Walter and Dixon of their money, because the evidence demonstrated that he intended to perform under the contract. Wells argues that he and his crews worked at the Walter home from January 2006 through June 2006, completing a significant portion of the contract. Wells states that he purchased materials and supplies for the project and secured labor to complete the renovations. *Page 11 
 {¶ 40} In claiming that his convictions were against the manifest weight of the evidence, Wells relies on Coleman, supra, in which we reversed three out of four of the defendant's convictions for both theft beyond the scope and theft by deception arising out of his failure to complete four different roofing contracts. As to the first roofing contract, we concluded that the State had failed to prove that Coleman intended to deprive the homeowners of more than $5,000, because the homeowners had admitted that Coleman had done a significant amount of work and had obtained the materials to complete the job.
 {¶ 41} Likewise, we reversed the convictions concerning Coleman's dealings with a second homeowner, because Coleman had partially performed the roofing contract by tearing off the old roof, installing underlayment, and partially installing new shingles. We stated that "[t]he fact that Coleman performed a significant amount of work under the contract with [the homeowner] indicates that Coleman intended to perform according to the contract." We also found that Coleman did not use the homeowner's money beyond the scope of his consent, because the money could be used on any portion of the contract.
 {¶ 42} As to Coleman's contract with a third homeowner, we reversed Coleman's conviction despite the fact that Coleman had not performed any work on the house. We stated that "the mere fact that Coleman attempted to order * * * shingles indicates he intended to perform the work according to the contract when he took the money * * *." We also noted that Coleman had executed a promissory note stating that he would repay the homeowner and that Coleman later called the homeowner indicating that he had shingles for the roof and was willing to complete the roofing job. *Page 12 
At that point, the homeowner rejected Coleman's offer.
 {¶ 43} We affirmed Coleman's convictions for theft beyond the scope of consent and theft by deception concerning a fourth home. There, Coleman had taken $8,000 from the homeowner, yet he never ordered materials for the project, never supplied materials, and never began work on the home.
 {¶ 44} In convicting Wells of both theft by deception and theft beyond the scope of consent, the trial court apparently found Wells' conduct to be akin to the fourth homeowner in Coleman. The court construed the renovation project as a "two-project case" with the interior portion of the contract constituting one project and the exterior portion constituting another. Although it was undisputed that Wells substantially completed the interior portion of the contract, Wells did not perform any of the exterior portion of the project. All the monies at issue related to the exterior renovations. The court thus reasoned that the evidence supported both counts of grand theft, totaling $13,689.21.
 {¶ 45} Assuming that the State presented sufficient evidence that Wells committed theft by deception and theft beyond the scope of consent concerning the $9,689.21 intended for bricks, we find his convictions to be against the manifest weight of the evidence. Initially, we note that the record unequivocally demonstrates that Walter and Dixon entered into a single contract with Wells. Although the contract was performed in two distinct phases — the interior renovations and the exterior renovations — and involved several draws related to each phase, the contract set forth an aggregate price of $49,674.19 and a general timetable for the completion of the work. Although no contract existed when Walter gave Wells money for the bricks, the *Page 13 
purchase of bricks was incorporated into the January 2006 contract. Accordingly, Wells' conduct regarding the exterior renovations is more properly considered in the light of the contract as a whole.
 {¶ 46} Beginning with theft by deception, the record establishes that Wells placed an order with Bryce Hill for Olde Detroit bricks on December 23, 2005, the day after Walter gave Wells $9,689.21 to purchase those bricks. On January 3, 2006, Dick Silvers, sales manager for Bryce Hill, issued a purchase order to Glen Gery Brick to obtain the brick. The bricks were to be delivered from Glen Gery to Bryce Hill on March 1. Shortly after Wells received the money for the bricks and placed the order with Bryce Hill, Wells entered into a formal contract with Walter and Dixon to renovate Walter's home. Wells began working on the interior of Walter's house, per the contract, in January 2006. Although Wells never paid for the Olde Detroit bricks and he pursued buying less expensive bricks through Snyder, the evidence does not support an inference that Wells had no intention of buying the bricks and of performing the exterior portion of the contract at the time hereceived the $9,689.21 check. To the contrary, as with the first three homeowners in Coleman, Wells' work on the home after receiving the money overwhelmingly demonstrates that Wells intended to purchase the bricks and that he lacked an intent to deprive Walter and Dixon of $9,689.21 in December 2005.
 {¶ 47} As for Wells' conviction for theft beyond the scope of consent concerning the $9,689.21, the weight of the evidence also indicates that Wells did not intend to deprive Walter and Dixon of their money when he failed to use the $9,689.21 for bricks. Although Wells understood that the $9,689.21 check was intended for the *Page 14 
purchase of the Olde Detroit bricks from Bryce Hill, there was no evidence that Wells was required to pay for the bricks when he placed the order with Bryce Hill in December 2005, and Bryce Hill's sales manager testified that the bricks would not be delivered to Bryce Hill until March 1, 2006.
 {¶ 48} Furthermore, beginning in January 2006, Wells worked on Walter's home for six months. Wells testified that he used all of the money he received from Walter and Dixon on the Walters' house project. Wells emphasized that Walter had caused substantial disruptions and delays for the interior renovations, which resulted in additional expenses. He asserted that Walter and Dixon owed him an additional $22,857.76 in unpaid costs for the interior portion of the contract. Although Walter and Dixon testified that they had fully paid for the interior work, Wells supported his assertion that they owed $22,857.76 with receipts and itemized lists of his expenses. Wells' testimony indicated that he had spent the $9,689.21 intended for the bricks on these other expenses. Although the evidence indicates that Wells exceeded the scope of Walter's consent when he used the $9,689.21 for items other than the bricks, the evidence nevertheless demonstrates that Wells used that money for other portions of the home, to Walter and Dixon's benefit. None of this is to suggest that Wells is or is not civilly liable to Walter and Dixon, but based on the record, we find that the manifest weight of the evidence does not support the conclusion that Wells intended to deprive Walter and Dixon of their money when he failed to use the $9,689.21 to purchase the bricks and he instead used the money on other house-related purchases.
 {¶ 49} Turning to the $4,000 check that Wells received in June 2006, the State presented ample evidence to support Wells' convictions for theft by deception and theft *Page 15 
beyond the scope of consent. According to Walter, on June 3, 2006, he and Wells "had a meeting * * * about what [Wells] was going to do to start the exterior contracting." At that time, Wells had not yet paid for any bricks. Wells represented to Walter, however, that he had already purchased the bricks and other exterior supplies. Based on that representation, Dixon wrote a check in the amount of $4,000 for exterior labor costs. Dixon testified that she would not have paid the $4,000 if she had known that bricks had not yet been purchased. Wells did not speak with Walter and Dixon after June 4, 2006, and he did not perform any exterior work on the home. Wells did not return Walter and Dixon's messages when they returned from their honeymoon, and they were unable to find Wells despite many attempts to locate him. Wells did not return the $4,000. Based on this evidence, there was sufficient evidence to establish that Wells had knowingly obtained the $4,000 from Dixon by deception, that he exceeded the scope of Dixon's consent when he failed to use the money for exterior work, and that he had the purpose to deprive the homeowners of their money, i.e., that he did not intend to complete the exterior portion of the contract.
 {¶ 50} In his defense, Wells testified that none of the $4,000 was intended for brickwork. Contrary to Walter's testimony, Wells asserted that the $4,000 was intended to cover work he had performed on an antique cabinet, as well as for work on Walter's sidewalk and front porch. Wells stated that he had applied the $4,000 to the "job as a whole." Wells further testified that he had arranged for bricks for Walter's home, and they were available for delivery. Wells stated that he intended to complete the contract when he left Walter and Dixon the note on June 19, 2006. Wells further explained that he went to the hospital emergency room on June 21, 2006, believing *Page 16 
that he was having a heart attack and that he remained in the hospital for several days. While at the hospital, he received an angry message from Walter, canceling the contract. Wells stated that he returned to the Walter home in early July, only to find another contractor working on the roofing. In his rebuttal testimony, Walter substantiated Wells' assertion that another contractor was working on the home in early July. Wells chose not to contact Walter thereafter.
 {¶ 51} Although Wells testified that he could have obtained bricks, that he intended to perform the exterior portion of the contract and that Walter had unreasonably canceled the contract, the trial court chose not to believe this testimony. The trial court was free to credit the State's evidence, and we give substantial deference to the trial court's assessments of credibility. Wells had not purchased any materials for the exterior work when Wells accepted payment for exterior labor. In addition, Wells' testimony indicated that he did not have money available to pay for the bricks and that he was seeking to purchase bricks from Snyder on credit. Although Wells went to Walter's home in July, there is no evidence that Wells attempted to speak with Walter and Dixon at that time. To the contrary, Wells admitted that he made no effort to contact Walter and Dixon after they returned from their honeymoon, and he did not return any of their messages. Reviewing the evidence as a whole, we cannot say that the trial court "lost its way" in finding Wells guilty of theft by deception and theft beyond the scope of consent as to the $4,000.
 {¶ 52} In summary, we find that Wells' convictions for theft by deception and theft beyond the scope of consent based on the $9,689.21 check were against the manifest weight of the evidence. Wells' convictions for theft by deception and theft *Page 17 
beyond the scope of consent regarding the June 2006 check for $4,000 were based on sufficient evidence and were not against the manifest weight of the evidence.
 {¶ 53} The first and second assignments of error are overruled in part and sustained in part.
 III {¶ 54} Wells' third assignment of error states:
 {¶ 55} "APPELLANT WAS DENIED HIS CONSTITUTIONALLY GUARANTEED RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL."
 {¶ 56} In his third assignment of error, Wells claims that his trial counsel rendered ineffective assistance by failing to provide the June 12, 2006, letter to the State during discovery, which resulted in the document's exclusion at trial.
 {¶ 57} "In order to prevail on a claim of ineffective assistance of counsel, the defendant must show both deficient performance and resulting prejudice. Strickland v. Washington (1984), 466 U.S. 668,104 S.Ct. 2052. To show deficiency, the defendant must show that counsel's representation fell below an objective standard of reasonableness. Id. Trial counsel is entitled to a strong presumption that his conduct falls within the wide range of effective assistance. Id. The adequacy of counsel's performance must be viewed in light of all of the circumstances surrounding the trial court proceedings. Id. Hindsight may not be allowed to distort the assessment of what was reasonable in light of counsel's perspective at the time. State v. Cook (1992),65 Ohio St.3d 516, 524, 605 N.E.2d 70.
 {¶ 58} "Even assuming that counsel's performance was ineffective, the defendant must still show that the ineffectiveness adversely impacted the judgment. *Page 18 State v. Bradley (1989), 42 Ohio St.3d 136, 142, 538 N.E.2d 373. Reversal is warranted only where the defendant demonstrates that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. Id." State v. Dixon, Montgomery App. No. 21823, 2008-Ohio-755, ¶ 22-23.
 {¶ 59} During Wells' cross-examination of Walter, Wells attempted to introduce, as Defense Exhibit E, a letter from Wells to Walter, dated June 12, 2006. In this letter, Wells wrote that he had reviewed the contract, the work performed, and the payments received, and that he had concluded that he not received payment for a substantial amount of extras that he had performed. The letter reminded Walter that he (Wells) had collapsed in front of Walter's home, and Wells informed Walter that he had taken a few days off to recuperate. Wells stated that he would "complete installation of the breakfast nook light fixture and cleanup the property in anticipation of starting the masonry and brick work. I have made arrangements with the brick supplier and brick crew and they are ready on a moments notice." Wells informed Walter, however, that he would "not start any additional exterior work until we have come to an agreement as to the additional monies I believe are due CM3." At trial, both Walter and Dixon denied receiving the June 12, 2006, letter.
 {¶ 60} On appeal, Wells contends that his counsel rendered ineffective assistance when he failed to disclose the June 12, 2006, letter to the State during discovery. Wells asserts that the letter would have impeached Walter and proven that Wells lacked the intent to commit a theft offense.
 {¶ 61} In response, the State argues that Wells was not prejudiced by the exclusion of the June 12, 2006, letter. First, the State asserts that the June 12 letter *Page 19 
duplicated the testimony presented. Second, the State contends that the letter "is primarily concerned with matters other than these two checks" and, thus, the letter had no relevance to the State's theory of the case.
 {¶ 62} Although we disagree with the State that the June 12, 2006, letter was irrelevant, we find no reasonable probability that the outcome of the trial would have been different if the letter had been admitted. As noted by the State, Wells and two of his subcontractors, Nita Comeau and Bruce Thompson, testified about the delays and disruptions caused by Walter's continued presence in the home during the renovations, particularly when Walter returned home at lunchtime to eat and to shower. Wells had also testified to the changes and additional work that Walter requested, resulting in additional expenses. Wells further testified that he had collapsed in front of Walter's home in early June and that Walter had asked him to cease work on the exterior until after the wedding. Accordingly, much of the information in the letter was presented to the court through witness testimony.
 {¶ 63} As to the statements in the June 12, 2006, letter regarding the exterior work on the property, Wells' testimony contradicted the letter's statement that Wells had made arrangements for the brick work. Wells testified that he did not place a formal order for bricks with Bryce Hill and he had not paid for bricks from Snyder. When asked by the court how he intended to pay for the bricks, Wells responded that he was applying to Snyder to pay on credit and he was hoping to receive payment from Walter for the extras he had completed. Based on Wells' testimony, the statement in the June 12 letter that he had made arrangements with the brick supplier was misleading and, thus, not helpful to Wells' case. Likewise, the letter's statement that *Page 20 
Wells would not start additional work until the parties came to an agreement on unpaid extras is not helpful considering that Wells never communicated with Walter and Dixon after they returned from their honeymoon. Accordingly, Wells has not demonstrated that the outcome of his trial would have been different had the June 12, 2006, letter been admitted as evidence. Consequently, Wells has failed establish that his counsel's assistance was ineffective.
 {¶ 64} The third assignment of error is overruled.
 IV {¶ 65} In light of our disposition of the first and second assignments of error, Wells' convictions will be affirmed to the extent that they are based on the June 4, 2006, check for $4,000. The judgment of the trial court will be modified to reflect that Wells' convictions constitute a fifth degree felony, pursuant to R.C. 2913.02(B)(2), and the trial court's judgment will be modified to order restitution to Walter and Dixon in the amount of $4,000.
BROGAN, J. and FAIN, J., concur.
Copies mailed to:
Scott D. Schockling
Bradley S. Baldwin
 Hon. Roger B. Wilson *Page 1