[Cite as *State v. Wallace*, 2016-Ohio-8515.]

**IN THE COURT OF APPEALS**

**ELEVENTH APPELLATE DISTRICT**

**ASHTABULA COUNTY, OHIO**

| | | |
|---|---|---|
| STATE OF OHIO, | : | **O P I N I O N** |
| Plaintiff-Appellee, | : | |
| - vs - | : | **CASE NO. 2016-A-0008** |
| DAVID MYRON WALLACE, JR., | : | |
| Defendant-Appellant. | : | |

Criminal Appeal from the Ashtabula County Court of Common Pleas, Case No. 2015 CR 00029.

Judgment: Affirmed.

*Nicholas A. Iarocci,* Ashtabula County Prosecutor, and *Shelley M. Pratt,* Assistant Prosecutor, Ashtabula County Courthouse, 25 West Jefferson Street, Jefferson, OH 44047-1092 (For Plaintiff-Appellee).

*Myron P. Watson,* 614 West Superior Avenue, Suite 1144, Cleveland, OH 44113 (For Defendant-Appellant).


CYNTHIA WESTCOTT RICE, P.J.

{¶1} Appellant, David Myron Wallace, Jr., appeals his conviction following a jury trial in the Ashtabula County Court of Common Pleas of three counts of theft from an elderly person. The principal issue is whether appellant's conviction was supported by sufficient, credible evidence. For the reasons that follow, we affirm.

{¶2} On February 12, 2015, appellant was charged in a three-count indictment with theft by deception from an elderly person of $1,500 in cash, a felony of the fourth

degree (Count One); theft by deception from an elderly person of $800 in cash, a felony of the fifth degree (Count Two); and theft by intimidation from an elderly person of $2,000 in cash, a felony of the fourth degree (Count Three). Appellant pled not guilty and the case proceeded to jury trial.

{¶3} Terry Dennison, who at the time of the offenses was 65 years old and disabled due to the loss of his leg in an industrial accident, owns and manages a commercial property on Route 20 in Ashtabula, Ohio. The property, which Mr. Dennison inherited from his parents, includes three businesses: a Dairy Queen, an auto parts store, a hair salon, and a parking lot.

{¶4} Mr. Dennison testified that on Monday, September 1, 2014, he was on the property when appellant pulled into the parking lot in a pick-up truck and trailer. Appellant told Mr. Dennison he was from Sandusky; did asphalt repair work; and was looking for work. Appellant told Mr. Dennison he had done asphalt repair work for some parking lots of nearby businesses. He gave Mr. Dennison a catalog containing photographs of several asphalt repair jobs he said he had done and gave him the name of one of his past customers. Appellant told Mr. Dennison he could repair his lot quickly and "make it pop."

{¶5} Mr. Dennison said he wanted to have the parking lot repaired and appellant seemed to have the necessary expertise so he agreed to hire him. Mr. Dennison said appellant gave him a quote for $2,200 and wrote up a contract. According to the contract, appellant agreed to patch, re-seal, and re-stripe the parking lot. The contract also provided that Mr. Dennison was to pay $1,500 "upfront" for materials and the balance of $700 "upon completion," for a total of $2,200. Mr. Dennison agreed to the terms and signed the contract.

2

{¶6}    Mr. Dennison testified that appellant said he wanted the $1,500 to be paid in cash, and told Mr. Dennison he would meet him at his bank the following day so he could get the cash before starting the work. Mr. Dennison agreed and met appellant at Andover Bank the next day.

{¶7}    Mr. Dennison said that on September 2, 2014, before meeting appellant at the bank, he, i.e., Mr. Dennison, stopped at the parking lot of appellant's past customer. The customer told Mr. Dennison that he had no problem with appellant and that he did a "fair" job.  The customer said that appellant wanted the money upfront; the customer refused, but appellant did the job anyway.  Mr. Dennison said that because appellant did a fair job for that customer, he felt it was safe for him to proceed.

{¶8}    Mr. Dennison said that, later that morning, he met appellant at the bank. Mr. Dennison withdrew $1,500 in cash and gave it to appellant.  Andover Bank gave Mr. Dennison a receipt for the withdrawal, which was admitted in evidence.  Appellant said he would get the materials and start the job on Friday, September 5, 2014.

{¶9}    Mr. Dennison said that appellant showed up at the property on September 5, 2014.  Appellant said he needed another $800 because he owed his supplier from past jobs he had done.  Mr. Dennison said he did not know what to do, but he gave him $800, which was $100 more than the full price of the job.  On that date, appellant wrote on the contract, "$800 Paid in full Thank you".

{¶10}   Appellant said he would start the job on Saturday, September 6, 2014. Mr. Dennison said he waited at the property all day on Saturday, September 6, 2014, and Sunday, September 7, 2014, for appellant to show up, but he never did. Mr. Dennison called appellant several times and finally got a hold of him.  Mr. Dennison said

3

appellant got "real snotty" with him on the phone. Appellant said that he had cut his finger so he could not work and that he would do the job the following weekend.

{¶11} During the following week, appellant called Mr. Dennison and said that he and his crew would be there Friday, September 12, 2014, for the whole weekend and that the job would be done by Sunday, September 14, 2014.

{¶12} Mr. Dennison said that appellant showed up on September 12, 2014. At the time, Mr. Dennison was in his truck in his parking lot. Appellant pulled up in his truck and had three black males with him. Appellant and the three men got out of the truck. Mr. Dennison said that one of these men was about seven feet tall and "was the biggest guy I've ever seen in my entire life." While the three black men looked around the parking lot, appellant got in Mr. Dennison's truck. Appellant said, "be careful what you say to those guys * * * because they're crazy." He said, "I don't trust 'em at all." He said, "they're good workers, but I wouldn't trust 'em." He said, "see the one guy there, don't say anything to him, he's got a gun."

{¶13} The three black men went in Mr. Dennison's truck. They sat next to Mr. Dennison and appellant went around and sat behind him. Appellant then told Mr. Dennison that this job would require more work than he thought so he needed another $2,000. Mr. Dennison testified he protested and appellant became angry. Mr. Dennison testified he was "scared" and did not know what to do. Mr. Dennison was visibly upset, and appellant said, "you're not gonna turn into a goddam crybaby on me, are you?" and started calling Mr. Dennison names. Mr. Dennison said he felt "intimidated" and told appellant he would go to the bank and get him the $2,000. He went to the bank while appellant and his crew waited for the money. Appellant withdraw $2,000 from his personal account at U.S. Bank. The bank gave him a receipt for the

4

withdrawal, which was admitted in evidence. Mr. Dennison brought the money back and gave it to appellant.

{¶14} Mr. Dennison said he told appellant to write on the contract that he gave appellant this extra $2,000. Appellant refused; instead, he wrote on the contract, "Received some more money" and initialed it "D.W."

{¶15} Appellant told Mr. Dennison they would do the lot on Saturday and Sunday, September 13 and 14, 2014, but they never showed up.

{¶16} Mr. Dennison said he called appellant on his cell phone three times. The first time, there was no answer; the second, he was put into voicemail; and the third, someone hung up on him.

{¶17} On Sunday afternoon, September 14, 2014, appellant called Mr. Dennison and said they were coming from Sandusky to get the rest of the money. Mr. Dennison said, "What money?" Appellant said the other $1,000 that Mr. Dennison owed him. Mr. Dennison told appellant he had already paid him $4,300 and he had not done a thing. Mr. Dennison told appellant he thought he was cheating him. Appellant started calling Mr. Dennison names. Mr. Dennison told appellant to show up and do the job he already paid him to do, but appellant never did.

{¶18} Mr. Dennison said later that day, he went to his daughter and son-in-law's house to ask them for advice. Mr. Dennison's son-in-law is Adam Simons, an Ashtabula Police officer.

{¶19} Officer Simons testified that his father-in-law, Mr. Dennison, came to his home and discussed problems he was having with appellant. Officer Simons said his father-in-law was very upset and crying. Officer Simons said he would call appellant for him to see if he could get him to do the job. Officer Simons called appellant while his

father-in-law was still at his home. Officer Simons identified himself and said his father-in-law, Mr. Dennison, had given him money and wants him to repair his parking lot. Officer Simons said, "I'm asking you, will you go over and just do the parking lot? That's all he wants done."

{¶20} Officer Simons said that appellant attacked him on the phone, saying "I don't F _ _ _ ing care who you are, you don't F _ _ _ ing scare me." With that, appellant hung up on Officer Simons.

{¶21} Officer Simons walked into the living room where his wife and father-in-law were, and Mr. Dennison's cell phone rang. Mr. Dennison held up the phone and said it was appellant calling him. Officer Simons listened and heard appellant say, "You better F _ _ _ ing tell your son-in-law he better never call me again."

{¶22} Officer Simons advised Mr. Dennison to file a police report. On the following day, September 15, 2014, Mr. Dennison went to the Ashtabula Police Department and made a report.

{¶23} Appellant testified on his own behalf. His testimony was convoluted and often rambling, unresponsive, and confusing. Appellant said he was born, raised, and resides in Ashtabula. He said his family moved to Huron in 2001, but he moved back to Ashtabula in about June 2014. He said he owns an asphalt seal-coating business. He said he has been in business for 15 years and has done about 2,000 jobs. He said he entered a contract with Mr. Dennison on September 1, 2014, pursuant to which he was supposed to repair Mr. Dennison's parking lot. The contract price was $1,500 upfront plus $700 upon completion. Appellant said $2,200 was a fair price for this job.

{¶24} Appellant said he told Mr. Dennison he would go to the bank with him to make Mr. Dennison feel comfortable because his involvement would be recorded on the

6

bank's video and he thought this would make Mr. Dennison feel confident that his job would get done.

{¶25} Appellant said he did not work on the job from September 2 to September 5, 2014. Further, he said he did not work on the job during the weekend of September 5, 2014 through September 7, 2014, because he cut his finger while fixing a lawn mower so he could cut the lawn of a disabled woman.

{¶26} Appellant said he called Mr. Dennison to tell him about his injury, and Mr. Dennison said that was fine and to just keep him informed. Appellant said he even texted him a photograph of his cut finger to prove he was injured. However, he could not say when he sent the photo to Mr. Dennison. He said the date would be on his cell phone, but he did not bring his phone to trial. Appellant said he told Mr. Dennison he would do the job the following weekend.

{¶27} Appellant said he came to the parking lot on Friday, September 12, 2014, prepared to do the work. He said he brought three workers with him. He said the three men were black and one of them is six foot seven inches tall.

{¶28} Appellant said they would have done the job on Friday and Saturday, September 12 and 13, 2014, but it rained on both days. Appellant did not offer any meteorological records in support. In contrast, Mr. Dennison testified the weather was fine and dry that weekend.

{¶29} Appellant said that on September 12, 2014, Mr. Dennison agreed that, due to the rain, it would not be possible for appellant to do the work that day.

{¶30} Appellant said that on Saturday, September 13, 2014, he saw the rain had loosened the surface of the asphalt parking lot so they also could not work that day. Appellant said he got in Mr. Dennison's truck, which was in the parking lot, and Mr.

7

Dennison asked what was the problem. Appellant told him they could not do the job because they needed more asphalt and there would be additional costs, but he would not know what those costs would be until Monday when his supplier was open. Appellant said Mr. Dennison agreed to pay whatever the additional costs might be. Contrary to Mr. Dennison's testimony, appellant said he never told Mr. Dennison the increase in price would be $2,000 and he never paid that amount.

{¶31} Appellant also said that Mr. Dennison wanted him to repair the handicap ramp and to add this to the cost of the project. Mr. Dennison testified he never asked appellant to do any work on the handicap ramp. Appellant offered nothing in writing to support his testimony about Mr. Dennison agreeing to pay any additional costs or asking him to repair the ramp.

{¶32} Appellant said the rain started again so they could not work and they returned to Sandusky.

{¶33} Appellant said that on the next day, Sunday, September 14, 2016, they showed up for work and the guys started working right away. Then, he said Mr. Dennison waived him over. Apparently to rebut Mr. Dennison's testimony about appellant demanding $800 on September 5, 2014, appellant said that on September 14, 2014, Mr. Dennison told him he did not trust the three men on his crew. Appellant said Mr. Dennison told him that he did not want the job done that day and that, as for the $700 balance due on the contract, he would pay appellant $700 that day plus an additional $100 to take the crew back to Sandusky. Appellant said Mr. Dennison told him to write "received some money" on the contract, and this was meant to refer to the $700 balance plus the $100 extra appellant allegedly agreed to pay him to stop working on Sunday and take his crew home.

8

{¶34} Appellant said he agreed to take his crew home and Mr. Dennison then gave him $800 in cash. Appellant said he left on Sunday because Mr. Dennison told him to get his workers off the property. However, appellant did not explain why he allegedly referenced the $800 payment twice on the contract, once by saying Mr. Dennison had paid $800 and another by saying appellant "received some more money." Mr. Dennison testified the former was written on the contract on September 5th when he gave appellant $800 and the latter was written on September 12th when he paid appellant the extra $2,000 he demanded.

{¶35} Appellant denied ever telling Mr. Dennison that one of the black males on his crew carried a gun.

{¶36} While appellant said he bought some materials for the job, he did not provide any receipts proving exactly what he allegedly bought or the amounts he allegedly paid.

{¶37} Appellant said he received a call from Mr. Dennison's son-in-law. He said the son-in-law told him to return his father-in-law's money. Then, appellant changed his testimony and said the son-in-law told him to get the job done. Appellant admitted he immediately called Mr. Dennison, but simply denied Officer Simons' testimony about appellant's threat on the phone to Mr. Dennison.

{¶38} On cross-examination, appellant admitted that he was paid $2,300, $100 more than the contract price; that he never returned any part of this fee; and that he never did the job.

{¶39} The jury returned its verdict finding appellant guilty of all counts as charged in the indictment. At sentencing, the court noted that appellant had previously been convicted of resisting arrest, attempted inducing panic, and violation of a

9

protection order. The court sentenced appellant to 18 months in prison on Count One, 12 months on Count 2, and 18 months on Count Three, the three terms to be served concurrently to each other, for a total of 18 months in prison. The court also ordered appellant to pay $4,300 in restitution.

{¶40} Appellant appeals his conviction and sentence, asserting five assignments of error. His first two are related and, for ease of discussion, are considered together and in reverse order. They allege:

{¶41} "[2.] The guilty verdicts entered were legally insufficient as a matter of law.

{¶42} "[1.] The guilty verdicts entered were against the manifest weight of the evidence."

{¶43} There is a fundamental distinction between a challenge to the sufficiency of the evidence and a challenge to the weight of the evidence. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). An appellate court reviewing the sufficiency of the evidence examines the evidence admitted at trial and determines whether, after viewing the evidence most favorably to the state, the jury could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 273 (1991). Whether the evidence is legally sufficient to sustain a verdict is a question of law, which we review de novo. *Thompkins, supra*.

{¶44} In contrast, the weight of the evidence concerns the inclination of the greater amount of credible evidence offered at trial to support one side of the issue rather than the other. *Thompkins, supra*, at 387. If, on weighing the evidence, the jury finds the greater amount of credible evidence sustains the issue that a party seeks to establish, that party will be entitled to its verdict. *Id.*

**{¶45}** "[A]n appellate court will not reverse a judgment as being contrary to the weight of the evidence as long as there is some competent, credible evidence supporting the judgment." *In re Kangas*, 11th Dist. Ashtabula No. 2006-A-0084, 2007-Ohio-1921, ¶81. The manifest-weight standard of review is the same in a civil case as in a criminal case. *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶17.

**{¶46}** When applying the manifest-weight standard of review, the reviewing court reviews the entire record, "'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered.'" *Eastley, supra,* quoting *Tewarson v. Simon*, 141 Ohio App.3d 103, 115 (9th Dist.2001).

**{¶47}** When examining witness credibility, "[t]he choice between credible witnesses and their conflicting testimony rests solely with the finder of fact and an appellate court may not substitute its own judgment for that of the finder of fact." *State v. Awan*, 22 Ohio St.3d 120, 123 (1986). Moreover, if the evidence is susceptible to more than one interpretation, a reviewing court must interpret it in a manner consistent with the verdict. *Warren v. Simpson*, 11th Dist. Trumbull No. 98-T-0183, 2000 Ohio App. LEXIS 1073, *8 (Mar. 17, 2000).

**{¶48}** "The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). Hence, the role of a reviewing court is to engage in a limited weighing of the evidence introduced at trial in order to determine whether the state carried its burden of persuasion. *State v. Brown*, 11th Dist. Trumbull No. 2002-T-0077, 2003-Ohio-7183, ¶52, citing *Thompkins, supra*, at 390.

11

However, an appellate court must defer to the factual findings of the jury regarding the weight to be given the evidence and credibility of the witnesses. *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus.

{¶49} R.C. 2913.02, theft, is defined, in relevant part, as follows: "No person, with purpose to deprive the owner of property * * *, shall knowingly obtain or exert control over * * * the property * * * in any of the following ways: * * * (3) By deception; * * * (5) By intimidation.

{¶50} Further, R.C. 2913.02(B)(3) provides in relevant part:

{¶51} [I]f the victim of the offense is an elderly person, * * * a violation of this section is theft from a person in a protected class, and division (B)(3) of this section applies. Except as otherwise provided in this division, theft from a person in a protected class is a felony of the fifth degree. If the value of the property or services stolen is one thousand dollars or more and is less than seven thousand five hundred dollars, theft from a person in a protected class is a felony of the fourth degree.

{¶52} "Deception" is defined at R.C. 2913.01(A) as "knowingly deceiving another * * * by any false or misleading representation * * * or by any other conduct, act, or omission that creates, confirms, or perpetuates a false impression in another * * *.

{¶53} Further, "elderly person" is defined at R.C. 2913.01(C)(C) as "a person who is sixty-five years of age or older."

{¶54} Appellant argues the state failed to present sufficient evidence of *deception* with respect to Counts One and Two ($1,500 paid on September 2, 2014 and $800 paid on September 5, 2014, respectively) and *intimidation* with respect to Count Three ($2,000 paid on September 12, 2014).

{¶55} Under Ohio law, "circumstantial evidence can have the same probative value as direct evidence," and "[a] conviction can be sustained based on circumstantial

12

evidence alone." *State v. Franklin*, 62 Ohio St.3d 118, 124 (1991). Because it is impossible to read one's mind, absent an admission of guilt, intent cannot be proven by direct evidence; rather it is determined by the surrounding facts and circumstances, i.e., circumstantial evidence. *State v. Garner*, 74 Ohio St.3d 49, 60 (1995). It is within the province of the jury to consider the probative value of the evidence, whether direct or circumstantial, and to draw reasonable inferences from the facts and testimony in evidence. *State v. Spikes*, 9th Dist. Lorain No. 05CA008680, 2006-Ohio-1822, ¶21, citing *State v. Group*, 98 Ohio St.3d 248, 2002-Ohio-7247, ¶114.

{¶56} To prove theft by deception by a contractor, the state must prove that when the defendant-contractor took the money, he had no intent to repay it or to perform the work under the contract. *State v. Wells*, 2d Dist. Champaign No. 2008 CA 6, 2009-Ohio-908, ¶38. In *Wells*, the victim paid the defendant-contractor $4,000 to perform brick work on the victim's home. The defendant had not yet paid for any bricks, but represented to the victim that he had. Further, the defendant did not perform any of the brick work and did not return the $4,000. The Second District held there was sufficient evidence to establish that the defendant knowingly obtained the $4,000 by deception and that he had the purpose to deprive the victim of his money, i.e., that the defendant did not intend to complete the home renovation contract. *Id.* at ¶49. The appellate court noted that, although the defendant testified he intended to perform the work, the trier of fact was free to discredit his testimony. *Id.* at ¶51.

{¶57} In *State v. Snyder*, 5th Dist. Licking No. 2008-CA-25, 2008-Ohio-6709, appeal not allowed by Ohio Supreme Court at 121 Ohio St. 3d 1501, 2009-Ohio- 2511, the defendant-contractor took money from three elderly victims to perform work on their homes, which he agreed to perform but never performed. He performed part of one of

13

the jobs, but only after he was indicted. The defendant was convicted of multiple counts of theft by deception from elderly persons. The Fifth District affirmed, holding that the foregoing evidence was sufficient to support appellant's conviction and that, although appellant argued he intended to perform the work and to pay the monies back to the victims, the credibility of the witnesses was an issue for the jury. *Id.* at ¶30-34.

{¶58} In *State v. Capone*, 8th Dist. Cuyahoga No. 86281, 2006-Ohio-1537, the defendant-contractor approached the victim-homeowner about doing a project in the victim's basement. Based on his repeated requests, the victim paid him funds for his alleged purchase of materials; however, the defendant did not perform any of the promised work. The defendant told the detective the project was 50% done, but he could not explain the work he performed or identify the materials purchased. The defendant was convicted of theft by deception. The Eighth District affirmed, holding there was ample proof of the defendant's intent to deprive the victim of her money by deception. *Id.* at ¶35.

{¶59} Turning to the instant case, after Mr. Dennison paid the $1,500 deposit, he said appellant repeatedly asked for more money and repeatedly promised to perform the work, but he never even started it.

{¶60} Appellant told Mr. Dennison he would perform the job on September 5, 2014. Although he showed up on that date, instead of working, he told Mr. Dennison he needed $800 more to pay his supplier for past jobs and Mr. Dennison paid it. Then, because appellant promised to start working on Saturday, September 6, 2014, Mr. Dennison waited for him to show up that Saturday and Sunday, but he never came. Mr. Dennison called appellant several times and when he finally reached him, appellant was

14

"real snotty" with him and told him he cut his finger and would start the job on September 12, 2014 and complete it by September 14, 2014.

{¶61}  Appellant did show up on September 12, 2014, with his three-man "crew." But after he told Mr. Dennison, "be careful what you say to those guys * * * because they're crazy;" "I don't trust 'em at all;" and, "see the one guy there, * * * he's got a gun," the three black men got in the truck with appellant and Mr. Dennison, and appellant then told Mr. Dennison he needed another $2,000.  When appellant called Mr. Dennison a "goddam crybaby" and other names, Mr. Dennison felt "intimidated" and paid him the extra $2,000.  Yet, appellant performed no work.

{¶62}  Appellant told Mr. Dennison he would do the job on Saturday and Sunday, September 13 and 14, 2014, but he never showed up.

{¶63}  On September 14, 2014, when appellant called Mr. Dennison and told him he was on his way to get "the other $1,000" Mr. Dennison owed him, Mr. Dennison told him he did not owe him anything and he thought appellant was cheating him.  While appellant was calling him names, Mr. Dennison told him to come and do the job for which he had already paid, but he never did.  Contrary to appellant's argument, Mr. Dennison never agreed to pay more than the original contract price.

{¶64} The parties presented conflicting evidence regarding Mr. Dennison's payment to appellant of the extra $2,000.  Mr. Dennison said that on September 12, 2014, after he paid this amount, he told appellant to write on the contract that he paid this amount, but appellant refused and simply wrote, "received more money."  At trial, appellant denied ever receiving the extra $2,000 on September 12, 2014, and, instead, testified that Mr. Dennison gave him $800 on September 14, 2014, to stop working and to take his crew home because Mr. Dennison did not like them.  In resolving this conflict

15

in favor of Mr. Dennison, the jury could reasonably infer appellant refused to give Mr. Dennison a receipt for $2,000 because appellant did not want there to be written proof that Mr. Dennison had paid him this additional amount.

**{¶65}** Mr. Dennison said he bought all the materials for the job and his receipts were admitted in evidence. While appellant testified he bought some materials, the jury could consider he did not provide any receipts showing what he allegedly bought or the amount he allegedly paid.

**{¶66}** Although appellant's conduct on September 12, 2014 relates directly to Count Three, theft by intimidation, it is also pertinent to Counts One and Two, theft by deception. While appellant committed the three thefts separately, each was part of the same course of criminal conduct, i.e., the "offenses involved the same victim," the "offenses were committed by the offender in his same * * * capacity or relationship" to the victim, or the "offenses were committed as part of the same transaction or chain of events." R.C. 2901.12(H). Since appellant used intimidation to get more money from Mr. Dennison on September 12, 2014, the jury could reasonably infer the entire transaction was a sham.

**{¶67}** Further, when Officer Simons called appellant on September 14, 2014, and said, "I'm asking you, will you go over and just do the parking lot? That's all he wants done," appellant swore at him and *hung up on him.* Since Officer Simons called appellant on behalf of Mr. Dennison and gave him this opportunity to perform the work, by bluntly refusing Officer Simons' request, the jury could reasonably infer appellant never intended to do the work.

**{¶68}** Further, according to Mr. Dennison, he paid the full contract price plus $100, and, although appellant promised he would start working on five different dates, he never did; instead, he kept the money and repeatedly demanded more.

**{¶69}** Construing the evidence most strongly in favor of the state, as we are required to do in considering a sufficiency challenge, the state presented sufficient circumstantial evidence from which, if believed, the jury could reasonably infer that appellant knowingly obtained money from Mr. Dennison by deception by promising to perform work he did not intend to perform.

**{¶70}** Further, intimidation is the "creation of fear." *State v. Thompson*, 7th Dist. Columbiana No. 13 CO 20, 2014-Ohio-1225, ¶16. Mr. Dennison, an elderly amputee, testified that when (1) appellant told him he did not trust the men in his crew and one of them carried a gun; (2) the three workers got in his truck and sat next to him; and (3) appellant then demanded the additional $2,000, he, i.e., Mr. Dennison, was frightened and felt intimidated.

**{¶71}** Based on the foregoing evidence, the state presented sufficient evidence to support the jury's guilty verdict of two counts of theft by deception ($1,500 on September 2nd and $800 on September 5th) and one count of theft by intimidation ($2,000 on September 12th).

**{¶72}** With respect to appellant's manifest-weight challenge, he argues this was simply a case where appellant was unable to perform the job in a timely fashion due to "his finger injury and personal circumstances." However, in light of the evidence presented, the jury was entitled to find appellant's excuses were not credible.

**{¶73}** Next, appellant argues he was willing to perform the job, although he raised the price on September 13, 2014, "due to the extensive nature of the work

17

needed to complete the task." However, Mr. Dennison testified that he paid the additional $2,000 appellant demanded on September 12, 2014, and that, although appellant promised to return to perform the job on September 13th and September 14th, he never showed; he only called Mr. Dennison on September 14th, demanding $1,000 more.

**{¶74}** Further, appellant argues that Mr. Dennison did not testify there was any link between the presence of the three black males and the increase in price of the job by $2,000. However, to the contrary, Mr. Dennison testified he was "scared" and felt "intimidated" by what appellant told him about his three workers and the fact that appellant demanded $2,000 more after appellant and his crew surrounded Mr. Dennison inside his truck.

**{¶75}** Based on our review of the record, the state presented sufficient evidence that appellant used deception and intimidation to steal $4,300 from Mr. Dennison. Moreover, Mr. Dennison and appellant presented conflicting versions of the events. In finding appellant guilty, the jury obviously found Mr. Dennison to be more credible than appellant. In doing so, we cannot say the jury clearly lost its way and created such a manifest miscarriage of justice that appellant was entitled to a new trial.

**{¶76}** For his third assignment of error, appellant alleges:

**{¶77}** "The trial court erred and abused its discretion when it did not impose a community control sentence when the defendant was convicted of a low-level non-violent offense(s), and the court made no findings under Revised Code of Ohio, Section 2929.13(b)(1)(c)."

**{¶78}** Appellant argues that because he was a first-time felony-four and felony-five offender, the trial court was required to follow the statutory mandates set forth under

18

R.C. 2929.13(B). Under R.C. 2929.13(B), appellant maintains, he was presumptively entitled to community control as a first-time felony-four and felony-five offender. He contends that, because the trial court failed to consider or make findings under the statute, the trial court's sentence is contrary to law.

{¶79} R.C. 2929.13(B)(1)(a) provides that, for a nonviolent fourth- or fifth-degree felony, there is a presumption of community control of at least a year's duration if all of the following are met: (1) the offender has not previously been convicted of or pleaded guilty to a felony offense; (2) the most serious charge at the time of sentencing is a fourth- or fifth-degree felony; (3) if, in a case where the court believes that no acceptable community-control sanctions are available, the court requests a community-control option from the department of rehabilitation and correction, and the department identifies a program of at least one year; and (4) the offender has not previously been convicted of or pleaded guilty to a misdemeanor offense of violence committed during the two years before the commission of the instant offense.

{¶80} In reviewing felony sentences, we apply the clear and convincing standard of review in R.C. 2953.08(G)(2). *State v. Parrado*, 11th Dist. Trumbull No. 2015-T-0069, 2016-Ohio-1313, ¶6.

{¶81} This court addressed virtually the same argument appellant asserts in this case in *Parrado*, *supra*, as follows:

> {¶82} In this case, although appellant pleaded guilty to nonviolent fifth-degree felonies, his plea was to 12 nonviolent fifth-degree felonies. The plain language of R.C. 2929.13(B)(1)(a) states, "if an offender is convicted of or pleads guilty to *a felony of the fourth or fifth degree* that is not an offense of violence or that is a qualifying assault offense, the court shall sentence the offender to a community control sanction" if each listed factor applies. (Emphasis sic.) If the legislature intended the presumption pertaining to community control to apply to situations in which an offender was

19

convicted of or pleaded guilty to multiple felonies of the fourth or fifth degree, it could have pluralized these terms. It did not do so. As such, we construe the statute to envelop only those situations in which a qualifying offender has been convicted of or pleaded guilty to a singular, nonviolent felony of the fourth [or] fifth degree. *Parrado* at ¶23.

{¶83} Because appellant was found guilty of not one, but, rather, multiple felonies of the fourth or fifth degree, the presumption of community control in R.C. 2929.13(B)(1)(a) did not apply. As a result, the trial court did not err in imposing a prison sentence.

{¶84} For his fourth assignment of error, appellant contends:

{¶85} "The trial court erred when it imposed a maximum prison term of 18 months without providing sufficient findings."

{¶86} Appellant argues the trial court failed to make the "necessary findings" regarding the purposes and principles of felony sentencing in R.C. 2929.11 and the seriousness and recidivism factors in R.C. 2929.12. As noted above, we apply the standard of review set forth in R.C. 2953.08(G) in reviewing felony sentences. *Parrado* at ¶6.

{¶87} We note that in the court's judgment on sentence, the court stated that in imposing appellant's sentence, the court "considered * * * the purposes and principles of sentencing under R.C. 2929.11 [and] the seriousness and recidivism factors relevant to the offense and offender pursuant to R.C. 2929.12."

{¶88} The Supreme Court of Ohio in *State v. Foster*, 109 Ohio St.3d 1, 2006-Ohio-856, held that R.C. 2929.11 and R.C. 2929.12 do not mandate judicial fact-finding. *Foster* at ¶42. Rather, "[t]he court is merely to 'consider' the statutory factors." *Id.* Thus, in sentencing a defendant for a felony, "a court is merely required to 'consider' the

20

purposes and principles of sentencing in R.C. 2929.11 and the statutory * * * factors set forth in R.C. 2929.12." *State v. Lloyd*, 11th Dist. Lake No. 2006-L-185, 2007-Ohio-3013, ¶44. The trial court satisfies its obligation to consider the sentencing guidelines in R.C. 2929.11 and R.C. 2929.12 by stating that it considered them. *State v. Whitman*, 11th Dist. Lake No. 2011-L-131, 2012-Ohio-3025, ¶12-13; *State v. DeNiro*, 11th Dist. Lake Nos. 2012-L-121 and 2012-L-122, 2013-Ohio-2826, ¶26-27.

{¶89} Because the trial court stated that it considered R.C. 2929.11 and R.C. 2929.12 in sentencing appellant, the court complied with these statutes and did not err in imposing appellant's sentence.

{¶90} For appellant's fifth and final assignment of error, he alleges:

{¶91} "The trial Court erred in sentencing the appellant for three (3) theft crimes arising from the same conduct, and the convictions should have been merged as allied offenses pursuant to Revised Code of Ohio, Section 2941.25, for sentencing purposes."

{¶92} R.C. 2941.25 reflects the General Assembly's intent to prohibit or allow multiple punishments for two or more offenses resulting from the same conduct. *State v. Washington*, 137 Ohio St.3d 427, 2013-Ohio-4982, ¶11. R.C. 2941.25 provides:

{¶93} (A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment * * * may contain counts for all such offenses, but the defendant may be convicted of only one.

{¶94} (B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment * * * may contain counts for all such offenses, and the defendant may be convicted of all of them.

{¶95} In *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, the Supreme Court of Ohio held that when determining whether multiple offenses are allied offenses

21

of similar import under R.C. 2941.25, "the conduct of the accused must be considered." *Id.* at syllabus. Further, in making such determination, "the question is whether it is possible to commit one offense and commit the other with the same conduct * * *." *Id.* at ¶48. "If the multiple offenses can be committed by the same conduct, then the court must determine whether the offenses were committed by the same conduct, i.e., 'a single act, committed with a single state of mind.'" *Id.* at ¶49. "If the answer to both questions is yes, then the offenses are allied offenses of similar import and will be merged." *Id.* at ¶50.

{¶96} More recently, in *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, the Ohio Supreme Court reaffirmed its holding in *Johnson* that in determining the existence of allied offenses, the emphasis is on the defendant's conduct, rather than an abstract comparison of the elements of the subject offenses. *Ruff* at ¶16, 26. However, the Court in *Ruff* stated that the *Johnson* test is "incomplete because R.C. 2941.25(B) provides that when a defendant's conduct constitutes two or more offenses of dissimilar import, the defendant may be convicted of all of the offenses." *Ruff* at ¶16. The Court in *Ruff* held: "In determining whether offenses are allied offenses of similar import within the meaning of R.C. 2941.25, courts must evaluate three separate factors - the conduct, the animus, and the import." *Id.* at paragraph one of the syllabus. Further, "[t]wo or more offenses of dissimilar import exist within the meaning of R.C. 2941.25(B) when the defendant's conduct constitutes offenses involving separate victims or if the harm that results from each offense is separate and identifiable. *Id.* at paragraph two of the syllabus. The Court in *Ruff* explained:

{¶97} A trial court and the reviewing court on appeal when considering whether there are allied offenses that merge into a single conviction under R.C. 2941.25(A) must first take into account the conduct of

22

the defendant. In other words, how were the offenses committed? If any of the following is true, the offenses cannot merge and the defendant may be convicted and sentenced for multiple offenses: (1) the offenses are dissimilar in import or significance - in other words, each offense caused separate, identifiable harm, (2) the offenses were committed separately, [or] (3) the offenses were committed with separate animus or motivation. *Id.* at ¶25.

{¶98} Appellate courts apply a de novo standard of review in addressing the trial court's merger determination. *State v. Williams*, 134 Ohio St.3d 482, 2012-Ohio-5699, ¶28.

{¶99} In the instant case, during sentencing, the trial court stated:

{¶100} [A]lthough these are classified as fourth and fifth degree felonies, the Court does find it to be very serious. It was * * * what I would describe as a con that extended over a two week period. * * * [T]here were really 3 different incidents involved as far as taking the money on the 3 different occasions. And I think that the two things that are certainly un-controverted about it is that * * * you did receive the money, and of course the work was never done.

{¶101} Pursuant to *Johnson, supra*, while it was possible for appellant to commit his three theft offenses with the same conduct, his offenses were not in fact committed by the same conduct, i.e., "a single act." Further, appellant's conduct satisfied two of the tests in *Ruff*, either of which was sufficient to make the offenses not allied offenses of similar import. First, each offense caused separate and identifiable harm ($1,500; $800; and $2,000). Second, the offenses were committed on separate dates (September 2, 2014; September 5, 2014; and September 12, 2014) and thus committed separately.

{¶102} We therefore hold the trial court did not err in finding that the offenses of which appellant was convicted were not allied offenses of similar import.

23

{¶103} For the reasons stated in this opinion, the assignments of error lack merit and are overruled.  It is the order and judgment of this court that the judgment of the Court of Common Pleas of Ashtabula County is affirmed.


TIMOTHY P. CANNON, J.,

COLLEEN MARY O'TOOLE, J.,

concur.