[Cite as *State v. O'Donnell*, 2021-Ohio-3253.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
CHAMPAIGN COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 2020-CA-26 |
| | : | |
| v. | : | Trial Court Case No. 2020-CR-89 |
| | : | |
| SCOTT DOUGLAS O'DONNELL | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 17th day of September, 2021.

. . . . . . . . . . .

JANE A. NAPIER, Atty. Reg. No. 0061426, Assistant Prosecuting Attorney, Champaign County Prosecutor's Office, 200 North Main Street, Urbana, Ohio 43078
       Attorney for Plaintiff-Appellee

CHARLES M. BLUE, Atty. Reg. No. 0074329, 401 East Stroop Road, Kettering, Ohio 45429
       Attorney for Defendant-Appellant

. . . . . . . . . . . . .

WELBAUM, J.

{¶ 1} Defendant-appellant, Scott Douglas O'Donnell, appeals from his conviction in the Champaign County Court of Common Pleas after a jury found him guilty of one count of grand theft. In support of his appeal, O'Donnell contends that his conviction was not supported by sufficient evidence and was against the manifest weight of the evidence. O'Donnell also contends that the trial court's jury instructions were erroneous, that his trial counsel provided ineffective assistance, and that the cumulative effect of all the errors deprived him of a fair trial. Because the record establishes that O'Donnell's grand theft conviction was not supported by sufficient evidence, O'Donnell's conviction for grand theft will be vacated.

**Facts and Course of Proceedings**

{¶ 2} On May 11, 2020, a Champaign County grand jury returned an indictment charging O'Donnell with one count of grand theft in violation of R.C. 2913.02(A)(2), a felony of the fourth degree. The charges stemmed from a botched home construction project that O'Donnell agreed to perform for Richard and Amelita King in exchange for $93,700. It was alleged that O'Donnell knowingly used $41,000 of the project funds in a manner that went beyond the scope of the Kings' consent with the purpose to deprive the Kings of those funds. O'Donnell pled not guilty to the charge, and the matter proceeded to a jury trial. The following is a summary of the testimony and evidence that was presented at trial.

{¶ 3} O'Donnell is a contractor in Urbana, Ohio, who owns Landon Lee Construction. In the summer of 2017, the Kings approached O'Donnell to remodel their

Urbana residence. After discussing the project, the parties agreed that O'Donnell would install a front porch onto the Kings' residence; extend the Kings' living room to create an open concept kitchen, dining, and living room area; move the Kings' master bedroom to the back of the house; and install a walk-in closet and sunroom to the Kings' home.

{¶ 4} The parties did not execute a written construction contract but orally agreed that the Kings would pay O'Donnell $93,700 for performing the aforementioned work to their home. O'Donnell did, however, provide the Kings with a "Construction Cost Breakdown" that generally itemized the cost of the entire project. *See* State's Ex. 2. O'Donnell also provided the Kings with a series of invoices that divided the work into four phases. *See* State's Ex. 3. The invoices listed the work that was to be performed during each phase of the project and set forth the specific cost of each phase.

{¶ 5} The Kings worked with their bank, specifically loan officer Kerri Beavers, to refinance their home so that they could obtain a loan to pay for the construction project. The Kings successfully refinanced their home and Beavers placed the loan money in a "construction process" account. From that account, the Kings could request the bank to disburse funds to O'Donnell for the construction project as each phase of the project was completed.

{¶ 6} On October 29, 2018, the Kings authorized their bank to pay O'Donnell $24,000 to complete Phase I of the project, and the bank disbursed a check to O'Donnell in that amount. The Phase I work included demolishing the front and rear of the Kings' house, excavating for the footer and foundation, pouring the concrete footer and walls, installing rebar reinforcement and window vents, laying pea gravel with a vapor barrier, and relocating the gas line to the north end of the house. O'Donnell completed all of the

work listed under Phase I by February 2019. After this work was completed, O'Donnell requested funds for Phase II of the project.

{¶ 7} On February 6, 2019, the Kings authorized their bank to pay O'Donnell $41,000 to complete Phase II of the project, and the bank disbursed a check to O'Donnell in that amount. The Phase II work included purchasing materials for framing, purchasing and installing doors and windows, pouring a concrete porch, installing insulation, purchasing and installing roofing materials, and installing plumbing, electrical, and drywall. However, after O'Donnell received the $41,000, the work on the Kings' home came to a halt.

{¶ 8} On June 18, 2019, after no work had been completed for four months, the Kings received a letter from the Champaign County Building Regulations Department ("Building Department") stating that an application had been submitted on June 4, 2019, for the "construction of room additions." Defendant's Ex. A. The letter advised that: "The plans as submitted need additional information" and that "a site inspection by the building inspector indicates the footing and foundation has already been installed without the approval of the documents or required inspections." *Id.* The letter directed the Kings "to either secure the services of a registered design professional who shall provide written verification that the work installed complies with the Residential Code of Ohio, or remove the footing/foundation work and request a field inspection by [the Building Department] after the plans have been approved and permit issued." *Id.*

{¶ 9} It was not until the Kings received the Building Department's letter that they realized O'Donnell had completed Phase I of the project without obtaining the necessary permit. The Kings provided a copy of the Building Department's letter to both O'Donnell

and Beavers. When Beavers learned of the letter, she became concerned because the letter indicated that the Kings would not be able to move forward with Phase II of the project, which had already been paid for. Shortly after receiving the letter, Beavers contacted O'Donnell and asked him to redeposit the $41,000 until the issue with the Building Department was resolved. O'Donnell, however, assured Beavers that he was working with his engineer to resolve the foundation permit issue so that he could move forward with the project.

{¶ 10} On July 20, 2019, after O'Donnell failed to follow-up with Beavers, Beavers sent a letter to O'Donnell requesting him to return the $41,000. *See* State's Ex. 5. Beavers and O'Donnell thereafter exchanged several text messages regarding the matter and scheduled a meeting with the Kings. On August 20, 2019, Beavers and O'Donnell met the Kings at the bank in order to discuss the Building Department's letter. During that meeting, Beavers and the Kings once again requested O'Donnell to return the $41,000. In response, O'Donnell advised that he did not have the $41,000 because "he had invested it in his business." Trial Trans. Vol. I (Aug. 26, 2020), p. 261.

{¶ 11} On August 21, 2019, O'Donnell, Beavers, and the Kings met at the Building Department's office in order to determine how to get the foundation approved. While there, the Building Department gave them several different options for moving forward with the project. One of the options was to drill out a section of the foundation in order to verify the presence of rebar reinforcement and to ensure that the depth of the walls complied with building regulations. The Building Department indicated that as long as an engineer certified that everything complied with the building regulations, it would approve the requested permit and the project could move forward.

{¶ 12} After meeting with the Building Department, O'Donnell scheduled a time for an engineer to come out to the construction site and inspect the foundation. O'Donnell attended the inspection, which took place on August, 30, 2019. On the day of the inspection, O'Donnell sent a text message to Beavers stating that the rebar was "as expected" and attached a photograph of the rebar reinforcement within the wall. State's Ex. 7, p. 678. O'Donnell also told Beavers via text message that they were "[d]oing digging in just a few minutes," and he agreed to keep Beavers posted on their progress. *Id.* at 678-680. Beavers, however, did not hear back from O'Donnell.

{¶ 13} Approximately one week after the inspection took place, Beavers sent a text message to O'Donnell asking for an update on the foundation issue. Beavers also asked O'Donnell when he would be able to return the $41,000. O'Donnell responded to Beavers' text message by saying: "My engineer came out and inspected. He told me he sent the letter to the city that everything was okay. I called him yesterday [and] he was waiting to hear back from [the Building Department]. Working on putting things together to return funds." *Id.* at 681.

{¶ 14} A few weeks later, on September 20 and 23, 2019, Beavers sent two more text messages to O'Donnell requesting him to update her on the status of the foundation issue and the return of the $41,000. On September 23, 2019, O'Donnell responded: "Haven't heard anything from city" and "[d]oing what I can at the moment to get funds in order." *Id.* at 683-684.

{¶ 15} Shortly thereafter, on September 24, 2019, the Building Department sent a second letter to the Kings that stated the following:

Following our discussions concerning the construction problems at

your home, the drawings and application have been put on hold until such time [as] another contractor makes a new application for the project.

Please note that the engineer has submitted his report concerning the footing/foundation installation. The footings and foundations have been structurally installed per code, however the required depth of the footings are in non-compliance. The code required depth is 32" below grade and the actual depth is 28" approximately.

This issue could be resolved in a number of ways which will be discussed with the new builder.

Defendant's Ex. B.

{¶ 16} Over the next four months, Beavers and O'Donnell remained in contact with one another. Beavers continued to send text messages to O'Donnell asking him when he was going to return the $41,000. On October 17, 2019, O'Donnell responded by saying that he was: "Hoping to hear back from the bank. I will let you know as soon as I get an answer back." State's Ex. 7 at 686. Approximately one month later, on November 15, 2019, O'Donnell sent another text message to Beavers stating that he was "[d]ealing with the attorney general with the matter mailing a letter out [M]onday for a resolution." *Id.* at 688. Then, on January 21, 2020, O'Donnell texted the following message to Beavers:

Hello, [K]erri, this is Scott O'Donnell. This is my new number, wanted to make sure you have it. I meet with an attorney Monday the 27th, to go over financial obligations and my goal is to get things together to set up payment arrangements and have a resolution over the [Kings'] project.

I will get a hold of you once I leave the office so I can be on track with you and the [Kings].

*Id.* at 690-691.

{¶ 17} On January 28, 2020, O'Donnell sent another text message to Beavers saying: "I met with attorney yesterday.   I * * * should be hearing back from him today[.] I will keep you posted on progress[.]   I think it's time I meet with him so I can put things together for both parties."   *Id.* at 693.   The following day, O'Donnell text messaged Beavers one last time and said:   "Have appointment set up for Friday at [1:30 p.m.], I will contact you as soon as I am out of meeting.   I should have an answer for you and the [Kings'] project."   *Id.* at 694.   O'Donnell, however, never contacted Beavers after this message, and O'Donnell never returned the $41,000.

{¶ 18} Except for purchasing and delivering framing materials for the floor joists, O'Donnell did not perform any of the work under Phase II of the project.   The Kings reported the matter to the Urbana Police Department in December 2019.   Sergeant Shawn Schmidt investigated the matter and interviewed O'Donnell.   During Sgt. Schmidt's interview, O'Donnell acknowledged that he had received $41,000 from the Kings and that he had failed to complete Phase II of the project.   O'Donnell also advised Sgt. Schmidt that he had spent $7,200 of the $41,000 on framing materials for the floor joists and that he did not have the rest of the money to return because his business was possibly going bankrupt.   Schmidt testified that he investigated O'Donnell's financial records and learned that O'Donnell only had $58 in his account at the end of March 2019.

{¶ 19} Following the State's presentation of evidence, O'Donnell moved for a Crim.R. 29 acquittal on grounds that the State had failed to establish the elements of

grand theft under R.C. 2913.02(A)(2). The trial court overruled the motion and the matter went to the jury. Following deliberations, the jury found O'Donnell guilty as charged. The trial court thereafter sentenced O'Donnell to serve 16 months in prison and to pay the Kings $34,000 in restitution plus court costs.

{¶ 20} O'Donnell now appeals from his conviction, raising four assignments of error for review.

**First Assignment of Error**

{¶ 21} Under his first assignment of error, O'Donnell contends that his conviction for grand theft in violation of R.C. 2913.02(A)(2) was not supported by sufficient evidence and was against the manifest weight of the evidence. Upon review, we agree that O'Donnell's conviction was not supported by sufficient evidence.

{¶ 22} "A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law." *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 10, citing *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997). "When reviewing a claim as to sufficiency of evidence, the relevant inquiry is whether any rational factfinder viewing the evidence in a light most favorable to the state could have found the essential elements of the crime proven beyond a reasonable doubt." (Citations omitted.) *State v. Dennis*, 79 Ohio St.3d 421, 430, 683 N.E.2d 1096 (1997). "The verdict will not be disturbed unless the appellate court finds that reasonable minds could not reach the conclusion reached by the trier-of-fact." (Citations omitted.) *Id.* "The issue of whether a conviction is supported by sufficient

evidence is a question of law, which we review de novo." *State v. Campbell*, 2d Dist. Montgomery No. 26575, 2016-Ohio-598, ¶ 6, citing *Thompkins* at 386.

**{¶ 23}** As previously noted, O'Donnell was convicted for grand theft in violation of R.C. 2913.02(A)(2), which provides that:

> No person, with purpose to deprive the owner of property * * *, shall knowingly obtain or exert control over * * * the property * * * in any of the following ways: * * *
>
> (2) Beyond the scope of the express or implied consent of the owner or person authorized to give consent[.]

**{¶ 24}** The language in R.C. 2913.02(A)(2) therefore indicates that "[o]nce a person lawfully has control over property with consent, that person cannot thereafter exert control for a different purpose. * * * If the individual begins to use the property for something outside what the owner specifically authorized, the individual has gone beyond the owner's consent." *State v. Dortch*, 2d Dist. Montgomery No. 17700, 1999 WL 819569, *4 (Oct. 15, 1999); *State v. Roberts*, 2d Dist. Montgomery No. 26431, 2015-Ohio-2716, ¶ 13.

**{¶ 25}** "[F]or a violation of R.C. 2913.02(A)(2), the State must prove that at the time the defendant exceeded the scope of consent of the owner of the [property], he had the intent to deprive the owner of the [property]." (Citations omitted.) *State v. Coleman*, 2d Dist. Champaign No. 2002-CA-17, 2003-Ohio-5724, ¶ 29. Pursuant to R.C. 2913.01(C)(3), the meaning of the term "deprive" includes "[a]ccept[ing] us[ing], or appropriat[ing] money, property, or services, with purpose not to give proper consideration in return for the money, property, or services, and without reasonable

justification or excuse for not giving proper consideration."

{¶ 26} In this case, there is no dispute that the Kings paid O'Donnell $41,000 for purposes of completing Phase II of their home construction project. There is also no dispute that O'Donnell received the $41,000 and invested a majority of it in his business without ever completing Phase II of the project. Therefore, the pivotal issue raised by O'Donnell in this appeal is whether he had the requisite intent to deprive the Kings of their $41,000 when he obtained control over those funds and invested them in something other than the Kings' project. Accordingly, this court must determine whether there was sufficient evidence presented at trial to establish that when O'Donnell used the $41,000 for something other than the Kings' project, he intended not to give the Kings proper consideration in return for their money.

{¶ 27} "Because it is difficult to prove a defendant's mental state by direct evidence, a defendant's intent is determined by considering the surrounding facts and circumstances." (Citations omitted.) *State v. Wells*, 2d Dist. Champaign No. 2008-CA-6, 2009-Ohio-908, ¶ 38. "It is therefore necessary to rely upon circumstantial evidence to establish purpose or intent." *State v. Messer*, 6th Dist. Lucas No. L-16-1109, 2017-Ohio-1223, ¶ 21. To that end, "[e]vidence of a defendant's conduct * * * may be used to establish intent to commit theft." (Citation omitted.) *State v. Hammerschmidt*, 9th Dist. Medina No. CA2987-M, 2000 WL 254902, *3 (Mar. 8, 2000). " '[P]ersons are presumed to have intended the natural, reasonable and probable consequences of their voluntary acts.' " *Wells* at ¶ 38, quoting *State v. Garner*, 74 Ohio St.3d 49, 60, 656 N.E.2d 623 (1995).

{¶ 28} In the context of a construction contract, this court has held that the

performance of a significant amount of work under the contract demonstrates an intent to perform under the contract. *Coleman*, 2d Dist. Champaign No. 2002-CA-17, 2003-Ohio-5724, at ¶ 40. We therefore disagreed with the notion that the intent to deprive a homeowner of their money could be inferred from a contractor's failure to complete a construction project where the evidence established that the contractor performed a significant amount of the work. *Id.* In contrast, we held that not performing any of the work under the contract or ordering any materials for the work amounted to evidence from which a reasonable trier of fact could infer an intent to deprive the homeowner of his or her money. *Id.* at ¶ 43.

{¶ 29} This court has also explained that simply using a homeowner's money for something other than materials for their project is not necessarily indicative of an intent not to perform under the contract. *Id.* at ¶ 37. This is because, absent an agreement for the contractor to use the homeowner's money only on the homeowner's project, the contractor can do whatever he or she desires with the money so long as the contractor performs under the contract. *Id.* at ¶ 38 and 40.

{¶ 30} This court has further held that when parties enter into a single construction contract that sets forth an aggregate price for the work, and when the work is to be performed and paid for in distinct phases, it is proper to consider the work performed "in light of the contract as a whole." *Wells*, 2d Dist. Champaign No. 2008-CA-6, 2009-Ohio-908, at ¶ 45. For example, in *Wells*, the construction contract at issue was to be performed in two distinct phases—the interior renovations and the exterior renovations—with several draws related to each phase. *Id.* Although Wells did not perform any of the exterior renovations (he simply ordered bricks that he never paid for), it was

undisputed that Wells substantially completed the interior portion of the project. *Id.* at ¶ 44 and ¶ 46. Given all the work that Wells had performed after receiving the homeowner's money, this court held that the evidence did not support an inference that Wells did not intend to perform the exterior portion of contract, as we found that Wells' work "overwhelming demonstrate[d]" that he lacked the intent to deprive the homeowners of their money. *Id.* at ¶ 46.

{¶ 31} Similar to *Wells*, the present case concerns a singular construction contract that set forth an aggregate price for the work, which was to be performed and paid for in four distinct phases. The evidence established that O'Donnell completed all the work contemplated under Phase I of the project. This included demolishing the front and rear of the Kings' house, excavating for the footer and foundation, pouring the concrete footer and walls, installing rebar reinforcement and window vents, laying pea gravel with a vapor barrier, and relocating the gas line to the north end of the house. We find this to be a significant amount of work that demonstrated O'Donnell's intent to perform under the contract.

{¶ 32} The evidence also established that after O'Donnell completed the work for Phase I, and after the Kings paid O'Donnell the $41,000 for Phase II, O'Donnell purchased $7,200 worth of framing material for the floor joists and had the framing material delivered to the Kings' residence. We find that this demonstrated that O'Donnell intended to perform the work under Phase II of the project.

{¶ 33} We also find it significant that after O'Donnell received the $41,000 for Phase II, he applied for a building permit, albeit late, with the Building Department. It is also significant that O'Donnell tried to rectify the problem with the foundation after the

Building Department advised that the permit he applied for could not be granted because the foundation was installed without the necessary inspection and approval. For example, shortly after learning of the foundation permit issue, O'Donnell spoke with Beavers and assured her that he was working with his engineer to resolve the issue. Thereafter, on August 20, 2019, O'Donnell met with Beavers and the Kings at the bank to discuss how they could move forward with the project in light of the issue with the foundation. O'Donnell also met with Beavers and the Kings at the Building Department's office building in order to inquire about what they could do in order to move forward with the project. Furthermore, O'Donnell scheduled and attended the necessary inspection to get the foundation approved. All of these actions taken by O'Donnell indicated that he was attempting to rectify the issue with the foundation so that he could move forward with the Kings' project, which evidenced an intent to perform the agreed-upon work.

{¶ 34} The evidence also established that the Building Department effectively banned O'Donnell from completing the Kings' project after the inspection. Specifically, the Building Department's post-inspection letter to the Kings advised that their home construction project had been "put on hold" until "**another contractor** makes a new application for the project." (Emphasis added.) Defendant's Ex. B. The letter also stated that the defect in the foundation "could be resolved in a number of ways which will be discussed with the **new builder**." (Emphasis added.) *Id.* This indicates that O'Donnell did not voluntarily abandon the project and thus negates the inference that O'Donnell failed to complete the Kings' project with the intent to deprive the Kings of their $41,000.

{¶ 35} The evidence further established that, after being effectively banned from

the project, O'Donnell remained in communication with Beavers for four months in an effort to update her on his attempt to return the $41,000. Specifically, the evidence established that O'Donnell advised Beavers that he was working with his bank and the attorney general in an attempt to return the funds. At one point, O'Donnell even mentioned that he was attempting to set up a payment arrangement. Although O'Donnell never returned the funds, his continued communication with Beavers regarding his attempts to return the money and his statement to Sgt. Schmidt indicating that his business was possibly going bankrupt, suggested that O'Donnell did not intend to deprive the Kings of their money.

{¶ 36} When viewing the evidence in a light most favorable to the State and when considering: (1) the significant amount of work that O'Donnell performed for Phase I of the project; (2) the $7,200 worth of framing materials that O'Donnell purchased and delivered for Phase II of the project; (3) the building permit that O'Donnell applied for after receiving the $41,000; (4) all of the actions O'Donnell took in attempt to rectify the issue with the foundation; and (5) O'Donnell's communications with Beavers regarding his attempt to return the $41,000, we do not find that a rational fact-finder could have found beyond a reasonable doubt that O'Donnell intended to deprive the Kings of their money, as the State did not present any evidence of the intent-to-deprive element of grand theft.

{¶ 37} We note that when ruling on O'Donnell's Crim.R. 29 motion, the trial court found that a reasonable factfinder could have concluded that O'Donnell intended to deprive the Kings of their money simply because the evidence established that O'Donnell was aware that no permit had been obtained for the work in Phase I when he accepted the funds for Phase II. The trial court reached this conclusion because it inferred that,

as a builder, O'Donnell knew that the lack of a permit for Phase I precluded his ability to perform the work for Phase II. The evidence, however, established that despite O'Donnell's failure to get the necessary permit for Phase I, it was indeed possible for him to work with the Building Department and complete Phase II as long as he had the necessary inspection performed on the foundation and as long as the foundation was approved and certified by an engineer. There was no evidence presented at trial establishing that O'Donnell was the specific individual who poured the foundation or that O'Donnell knew that the foundation depth was not in compliance with building regulations. Most importantly, there was no evidence suggesting that O'Donnell knew his failure to obtain the permit for Phase I would ultimately render him unable to complete the project.

{¶ 38} For the foregoing reasons, we disagree with the trial court's analysis and find that there was no evidence presented at trial to demonstrate that O'Donnell intended to deprive the Kings of their $41,000 when he took control over those funds and invested them in his business. Rather, the evidence of the surrounding facts and circumstances established that O'Donnell intended to perform the agreed-upon work in Phase II, but could not do so as a result of financial difficulties with his business. Therefore, the intent-to-deprive element for grand theft under R.C. 2913.02(A)(2) was not satisfied, which means that O'Donnell's conviction for grand theft was not supported by sufficient evidence. In light of this decision, it is unnecessary to address O'Donnell's argument that his conviction was against the manifest weight of the evidence.

{¶ 39} O'Donnell's first assignment of error is sustained.

**Second, Third, and Fourth Assignments of Error**

**{¶ 40}** Under his second, third, and fourth assignments of error, O'Donnell contends that: (1) the trial court's jury instructions were erroneous; (2) his trial counsel provided ineffective assistance; and (3) the cumulative effect of all the errors deprived him of a fair trial.   However, given our resolution of O'Donnell's first assignment of error, we need not address these issues because O'Donnell's grand theft conviction will be vacated on grounds that it was not supported by sufficient evidence.   Therefore, O'Donnell's second, third, and fourth assignments of error are overruled as moot.

### Conclusion

**{¶ 41}** Having sustained O'Donnell's first assignment of error, and having overruled his second, third, and fourth assignments of error as moot, O'Donnell's conviction for grand theft is vacated.

. . . . . . . . . . . . .

TUCKER, P.J. and EPLEY, J., concur.

Copies sent to:

Jane A. Napier
Charles M. Blue
Steven Hanna
Hon. Nick A. Selvaggio